1   JASON M. SKAGGS (NO. 202190)
    SKAGGS FAUCETTE LLP
2   530 Lytton Avenue, 2nd Floor
    Palo Alto, CA  94301
3   Telephone:  (650) 617-3226

4
    ANNA ST. JOHN (*pro hac vice*)
5   ST. JOHN LAW FIRM
    1900 General Taylor St.
6   New Orleans, LA 70115
    Telephone:  (917) 327-2392
7

8   *Attorney for PLAINTIFFS Francis Wang,*
    *individually and as Trustee of WFT-TNF,*
9   *a California Trust; and Laura Young, individually*
    *and as Trustee of WFT-TNG, a California Trust*
10

11

12                  **UNITED STATES DISTRICT COURT**
                 **NORTHERN DISTRICT OF CALIFORNIA**

13  FRANCIS WANG, individually as          Case No. 3:19-cv-00907-WHO
    Trustee of WFT-TNG, a California Trust,
14                                          **SECOND AMENDED COMPLAINT**
    and LAURA YOUNG, individually as
15  Trustee of WFT-TNG, a California Trust

16       Plaintiffs,                        1. Racial Discrimination in the Making or
                                            Enforcement of Contract
17                                          2. Racial Discrimination in the Making or
                                            Enforcement of Contract
18       v.                                 3. Racial Discrimination in Real Property
                                            Transactions
19                                          4. Racial Discrimination in Real Property
    MARTHA KONGSGAARD, individually         Transactions
20  and as Trustee of The Martha Kongsgaard 5. Conspiracy to Deprive Equal Protection Under
    GST Exempt Trust U/T/A dated October 21, the Laws
21  1993, PETER GOLDMAN, ALBERT F.          6. Conspiracy to Deprive Equal Protection Under
    CZAP, and BRIAN PELETTA,                the Laws
22                                          7. Failure to Prevent Conspiracy to Deprive Equal
23       Defendants.                        Protection Under the Laws
                                            8. Interference with Property Rights
24

25                                          [DEMAND FOR JURY TRIAL]

26

27

28

                            FIRST AMENDED COMPLAINT
                            Case No. 3:19-cv-00907-WHO

**TABLE OF CONTENTS**

**Page**

**JURISDICTION, VENUE, AND PARTIES** ..............................................................3

**INTRADISTRICT ASSIGNMENT** ........................................................................4

**GENERAL ALLEGATIONS** .................................................................................4

**FIRST CAUSE OF ACTION** ...............................................................................19

**SECOND CAUSE OF ACTION** ..........................................................................21

**THIRD CAUSE OF ACTION** ..............................................................................24

**FOURTH CAUSE OF ACTION** ..........................................................................26

**FIFTH CAUSE OF ACTION** ...............................................................................28

**SIXTH CAUSE OF ACTION** ..............................................................................31

**SEVENTH CAUSE OF ACTION** ........................................................................33

**EIGHTH CAUSE OF ACTION** ...........................................................................35

**PRAYER FOR RELIEF** .......................................................................................37

**DEMAND FOR JURY TRIAL** ............................................................................38

SECOND AMENDED COMPLAINT
Case No. 3:19-cv-00907-WHO

Plaintiffs allege as follows:

## JURISDICTION, VENUE, AND PARTIES

1.     PLAINTIFF FRANCIS WANG, individually, and as Trustee of WFT-TNG, a California Trust (hereinafter collectively referred to as "WANG") is, and at all times mentioned in this Complaint has been, a citizen of the State of California.  WANG is a citizen of the United States and is an Asian American male.

2.     PLAINTIFF LAURA YOUNG, individually, and as Trustee of WFT-TNG, a California Trust (hereinafter collectively referred to as "YOUNG") is and at all times mentioned in this Complaint has been a citizen of the State of California.  YOUNG is a citizen of the United States and is an Asian American female.  WANG and YOUNG are collectively referred to herein as "PLAINTIFFS."

3.     DEFENDANT MARTHA KONGSGAARD, individually and as Trustee of The Martha Kongsgaard GST Exempt Trust U/T/A dated October 21, 1993 (hereinafter collectively referred to as ("KONGSGAARD") is a Caucasian woman and a citizen of the State of Washington.

4.     DEFENDANT PETER GOLDMAN (hereinafter referred to as ("GOLDMAN") is a Caucasian male and a citizen of the State of Washington.

5.     DEFENDANT ALBERT F. CZAP (hereinafter referred to as "CZAP") is a Caucasian male and a citizen of the State of California.

6.     DEFENDANT PETER BRIAN PELETTA (hereinafter referred to as "PELETTA") is a Caucasian male and a citizen of the State of Nevada.

7.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     This Court has original jurisdiction of PLAINTIFFS' 42 U.S.C. §§ 1981, 1982, 1985, and 1986 claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4). The Court has supplemental jurisdiction of PLAINTIFFS' interference with property rights claim, Cal. Civil Code § 52.1, pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c).  DEFENDANTS are subject to personal jurisdiction in this District in that they each own property in the District and each committed the discriminatory acts alleged herein in this District.

**INTRADISTRICT ASSIGNMENT**

10.    Pursuant to Civil L.R. 3-2(d), this action shall be assigned to the San Francisco Division.  The subject discrimination in making and enforcement of contracts, discrimination in sale of real property, conspiracy to deny equal protection under the law, failure to prevent a conspiracy to deprive equal protection under the law, and interference with property rights, concern the sale and easement rights of real property located in Napa County, and the subject interference occurred on real property located in Napa County.

11.    Each of the claims set forth herein involves real property located in Napa County.

**GENERAL ALLEGATIONS**

12.    PLAINTIFFS reallege and incorporate each and every allegation set forth in the preceding paragraphs of this Complaint as if the same were fully set forth herein.

**I.    Plaintiffs Take Action to Protect Their Property and Keep the Neighborhood Safe**

13.    PLANTIFFS are married; and between 1988 and 2013, WANG held record title of that certain residential property located at 460 Stonecrest Drive, Napa, California 94558, more particularly known as Assessors' Parcel Number 052-030-008 (hereinafter referred to as "460 STONECREST"). WANG purchased the 4.6-acre 460 STONECREST property for the primary residence for himself and his wife, YOUNG.

14.    PLAINTIFFS became Trustees for the WFT-TNG, a California Trust ("Trust"), in 1998, and transferred record title to 460 STONECREST into the Trust effective January 2013 for the benefit of their three children.

15.    KONGSGAARD resides in Seattle, Washington and at all times relevant herein has maintained an ownership interest in that certain residential property located at 550 Stonecrest Drive, Napa, California 94558, more particularly known as Assessors' Parcel Number 052-030-052 (hereinafter referred to as "550 STONECREST"). KONGSGAARD acquired a one-third ownership interest in 550 STONECREST on November 3, 1980, when she inherited the property from her grandmother.  She became the sole owner of 550 STONECREST in December 2013.

16.    GOLDMAN resides in Seattle, Washington and is married to KONGSGAARD.

17.    CZAP purchased 600 Stonecrest Drive in Napa County, California in approximately

4

October 2012 as his residence and continues to own the property.

18.     PELETTA resides in Nevada.  In 2013 he purchased 440 Stonecrest Drive, Napa County, California, a parcel of real estate which shares a boundary with PLAINTIFFS on a northeastern edge of his land and on a southwestern edge of 460 STONECREST, and resided there until he moved to Nevada in or around 2021. He continues to own the property and rents it to a third party

19.     PLAINTIFFS' 460 STONECREST property and KONGSGAARD'S 550 STONECREST property have at all times relevant herein been located adjacent to each other, sharing a common boundary to the north and east of 460 STONECREST, and south and west of 550 STONECREST.  Until about 2018 there was a barbed wire fence running roughly parallel with the northeastern property border between 460 STONECREST and 550 STONECREST that PLAINTIFFS incorrectly believed was the border between the two properties.  The 550 STONECREST property of approximately 22 acres sits in the middle of a densely populated residential neighborhood.  KONGSGAARD became the sole owner in December 2013 through a various transaction with her siblings John Kongsgaard and Mary Kongsgaard in 2011-2013.

20.     PLAINTIFFS have lived at 460 STONECREST for over 34 years and raised their three children there.  In the early 1990s, PLAINTIFFS realized that the rough country property including the hillside above their house posed a serious fire danger.  It had overgrown and dried vegetation, weeds, brush, fallen trees and limbs, accumulated leaves, and debris.  The hillside ridge which is part of the adjacent 550 STONECREST property was steep and difficult to traverse with tall weeds and thick brush in summer and fall.  These conditions caused a serious potential fire hazard to PLAINTIFFS' home and property. PLAINTIFFS also discovered that the steep hillside on the ridge on 550 STONECREST behind their house was covered with loose rocks and large boulders which slid and rolled down the steep hillsides along with a torrent of water and other debris particularly during heavy rains.  The rocks and boulders caused damage to 460 STONECREST and posed a hazard to the safety of PLAINTIFFS and their three children.  On one occasion, a rockslide destroyed a deck just outside their children's bedroom.  The Kongsgaard siblings did not provide any maintenance or upkeep for the hillside on the north and east side of

1   the ridge for the entire time they owned it.

2       21.     Rockslides, earthquakes, and wildfires are endemic in Napa County.  After the 1991

3   Oakland Hills fire, and the heavy rains and flooding in the winter of 1992, the Wangs decided that

4   they needed to address the safety of their property.  They consulted with a deputy chief at Cal Fire

5   and consulted with and hired professionals including a landscape architect and civil engineer to

6   mitigate the hillside's instability and fire danger.  They learned that their home would be safer if

7   they expanded the defensible space near their home and provided access for small fire department

8   vehicles to the western and northern part of their property.  The Wangs' property, which sits in the

9   middle of a steep hill in the eastern side of Napa County, is the only home with level access to that

10  portion of the hillside.  During the mid-1990's PLAINTIFFS tried to reduce the fire fuel burden on

11  the hillside and to stabilize the hillside erosion and reduce the torrent of water debris coming down

12  the hillside.  To prevent erosion, between late 1995 and 1997, PLAINTIFFS created planting beds

13  with drip watering systems.   To stabilize the hillside near their home and prevent rocks and

14  boulders from rolling down the hillside, PLAINTIFFS installed a series of terraces to prevent

15  erosion and improve earthquake safety, and they had loose rocks, boulders, and debris removed.

16  PLAINTIFFS added gravel walkways and watered planting beds alongside the terraces, which

17  served as catch basins to slow the rush of water cascading down the hill during heavy rainstorms.

18  PLAINTIFFS also cleared brush for unpaved fire trails to offer level pathways to access and

19  service the rough terrain for fire prevention maintenance and so emergency crews could gain

20  access to create fire breaks and have a staging area to prevent the spread of wildfires.  Because of

21  the steepness of the hillside, in order to create a level pathway, certain locations required that the

22  trail be supported on the downhill side by retaining walls.  Nearly all of these improvements were

23  installed below the fence line PLAINTIFFS believed was the property line.[1]   They were told this

24

25  [1]The terraces and almost all of the fire trails described in relation to the 550 STONECREST
    property were installed in 1996 (the "1996 Improvements").  In addition, a pathway to the northeast

26  of the improvements was installed in 1999 (the "1999 Fire Trail").  The 1996 Improvements and
    1999 Fire Trails were all constructed within the barbed wire fence line.  Finally, the Wangs added

27  fire trails to the northwest that extended further than the fence line to provide access to clear the
    dead trees, leaves, shrubs, and other vegetation in 1997 (the "1997 Fire Trails").  The Wangs were

28  aware that the 1997 Fire Trails crossed over onto 550 STONECREST but were not aware that the

6

by the real estate broker who sold them the property. However, PLAINTIFFS later learned that the fence line did not mark the property boundary and PLAINTIFF's 550 IMPROVEMENTS were installed on 550 STONECREST. Some of the fire trails were constructed on 550 STONECREST. In all, PLAINTIFF's 550 IMPROVEMENTS consisted of approximately one-quarter acre of terraces as well as fire trails which crossed over only 1.39 acres of 550 STONECREST. From the time the professionals hired by the Wangs constructed the improvements in the mid-1990s until 2010, no one raised any issue about the improvements. MARTHA KONGSGAARD had not been to the area of 550 STONECREST where the improvements were located at any time between the mid-1990s and 2009, and she did nothing to maintain 550 STONECREST for the entire time she owned any part of it (going back to 1980).

22.     PLAINTIFFS made PLAINTIFF's 550 IMPROVEMENTS in order to protect PLAINTIFFS' home and family as well as the neighboring residences from rockslides, water, debris and wildfires.

23.     By virtue of PLAINTIFFS' use, improvements, and development of PLAINTIFF's 550 IMPROVEMENTS, they claim easement rights to the west hillside portion of 550 STONECREST adjacent to 460 STONECREST.

24.     PLAINTIFFS recognized the same severe fire dangers and erosion and rockslide hazards on the side of their property that bordered 440 STONECREST. In 1996-1997 they constructed certain improvements, including a fire trail system and turn around at the lower portion of their property to address those issues. Due to the steepness of the eroding hillside, the fire trail was supported by a retaining wall. A large gravel catch basin was also incorporated into the system to slow down and absorb the torrents of water eroding the hillside during heavy rain storms. When PLAINTIFFS constructed these improvements, both they as well as the then-owners of 440 STONECREST, the Weidlers, who had lived there for 30 years, understood that the property line between PLAINTIFFS' 460 STONECREST and 440 STONECREST down the hill was defined

_____

1996 Improvements or the 1999 Fire Trails installed within the fence line were on the 550 property. Collectively, the 1996 Improvements, the 1997 trails, and the 1999 Fire Trail are referred to herein as PLAINTIFF's 550 IMPROVEMENTS.

by a barbed wire fence stretching across the hill. This was confirmed by the real estate broker who sold them the 460 STONECREST property.  The improvements were built well within the barbed wire fence line.  In 2018, a survey showed that a small percentage of the improvements crossed over onto 440 STONECREST and that—contrary to the common understandings of PLAINTIFFS, PELETTA, and the previous property owners (the Weidlers)—the property boundary was not the fence line.  PELETTA had never previously raised concern about PLAINTIFFS' improvements or used the portion of 440 STONECREST where the fire trail system was located during his ownership of the property.

25.    By virtue of PLAINTIFFS' use, improvements, and development of 440 STONECREST, they claim easement rights to the portion of 440 STONECREST adjacent to 460 STONECREST, where their improvements cross over the property boundary into 440 STONECREST's 117,000 square feet of land.

**II.    Kongsgaard and Goldman String Plaintiffs Along in Contract Negotiations**

26.    In December 2009, as she was handling her mother's estate, Mary Kongsgaard approached WANG to ask if he and YOUNG were interested in buying all or a part of 550 STONECREST.  After those initial discussions, Mary and her husband walked the property with the Wangs and Mary casually mentioned that she thought that some of the improvements may cross over onto 550 STONECREST.  A subsequent survey later showed that, in fact, approximately .25 acres of terracing, as well as part of the fire trails that allowed for the removal of hazardous rocks and fire fuels from the otherwise neglected 550 property, crossed onto 550 STONECREST.  Months of negotiation and discussion between PLAINTIFFS, Mary Kongsgaard, and her husband followed, with Mary Kongsgaard touting the significance of the Kongsgaard family name and political clout in Napa County as well as her expertise with the Williamson Act to facilitate the sale to the Wangs.

27.    On May 28, 2010, Mary Kongsgaard sent a letter on behalf of her sister, MARTHA KONGSGAARD and brother, John Kongsgaard, who were co-owners of the property with her at that time, to WANG inviting him to make an offer to purchase a portion of 550 STONECREST. Mary wrote: *"We've done quite a bit of discovery regarding the Williamson Act. It seems that it*

*will be possible to cancel our contract. At this point the only reason to cancel would be to partition off a piece of 550 Stonecrest so that you could buy it. Before we would proceed in that direction, we would want an offer from you, then a signed agreement indicating the amount of land you would want, and then a check for earnest money."* (DEFS 0449 marked as Exhibit A).

28.     After further discussions, negotiations, and agreement with Mary Kongsgaard, on July 8, 2010, PLAINTIFFS typed the terms of their agreement  (DEFS 0312 marked as Exhibit B) committed to purchase a 12-acre portion of the property at 550 STONECREST.  The agreement was in the form of an option to purchase with a payment of $7,500.  If the option was exercised, that amount would be earmarked to defray survey and other expenses to be incurred in the lot line adjustment between 460 and 550.   The terms of the offer (hereinafter referred to as the "AGREEMENT") provided that PLAINTIFFS would pay $400,000 for the 12-acre parcel to then-co-owners Mary Kongsgaard, John Kongsgaard, and MARTHA KONGSGAARD, who would apply for a lot-line adjustment and to remove the Williamson Act, also known as the California Land Conservation Act of 1965, on the parcel.

29.     On September 8, 2010, MARTHA KONGSGAARD by and through her agent, John Kongsgaard, signed the AGREEMENT.  John Kongsgaard also signed the AGREEMENT on behalf of himself and Mary Kongsgaard.  Plaintiffs provided a check for $7,500, which the Kongsgaards deposited on September 14, 2010.[2]

30.     PLAINTIFFS understood the AGREEMENT as binding them to purchase, and binding the Kongsgaards to sell, the 12-acre parcel of 550 STONECREST described in the AGREEMENT.   Later, however, KONGSGAARD stated that she never intended for the AGREEMENT to be binding.  She and GOLDMAN continued to negotiate to sell a portion of 550 STONECREST to PLAINTIFFS but on different terms more favorable to KONGSGAARD,

---

[2] In *Kongsgaard v. Wang*, case no. 19CV000286, the California Superior Court for the County of Napa issued a statement of decision ruling that the AGREEMENT constituted a contract but that it only obligated the Kongsgaards to produce maps of the property to be purchased and the Kongsgaards fulfilled this sole responsibility.

1   including a smaller parcel and a higher per-acre price and sought a lease rather than a sale of the
2   property.

3       31.    On January 24, 2011, KONGSGAARD and then co-owners Mary and John
4   Kongsgaard signed an application for a Type "H" Agricultural Preserve Contract to renew the
5   Williamson Act coverage for 550 STONECREST.  (DEFS 0177, marked as Exhibit C.)  Neither
6   KONGSGAARD nor her co-owner siblings disclosed to PLAINTIFFS that they were renewing
7   the Williamson Act contract for ten years, rather than cancelling it as described in the
8   AGREEMENT.

9       32.    On March 11, 2011, KONGSGAARD and her siblings executed a 1031 Tax Free
10   Exchange Agreement with the closing of the transaction on April 30, 2011 which made the sale of
11   a portion of 550 STONECREST to PLAINTIFFS a violation of the tax code during the 2-year
12   investment holding period. KONGSGAARD and GOLDMAN did not disclose the existence of
13   this agreement until GOLDMAN informed YOUNG in an email dated October 10, 2011.

14       33.    On April 4, 2011, Mary Kongsgaard acting as the agent of KONGSGAARD sent a
15   letter to the Wangs which stated: "*We regret that we have been unable to reach an agreement*
16   *concerning the 12 acres belonging to 550 Stonecrest. We are no longer interested in pursuing*
17   *negotiations.*" (DEFS 0492, marked as Exhibit D).

18       34.    GOLDMAN stepped in on behalf of Mary Kongsgaard and MARTHA
19   KONGSGAARD to negotiate with PLAINTIFFS.  From May 2011 to January 14, 2013,
20   GOLDMAN made six changing demands for PLAINTIFFS' interest in 550 STONECREST.
21   These included (1) a lease rather than a sale of property, (2) a sale of only a small, 2-3 acre portion
22   of the property, (3) a sale of the 12 acres with PLAINTIFFS paying all costs, (4) a preliminary
23   understanding to take a 6-step process for a sale of 10.5 acres, (5) a term sheet ostensibly in
24   accordance with that preliminary understanding but providing that all provisions were non-binding
25   except for a lease of the property terminable by a 30-day notice, and (6) a sale of only 1.5-2 acres
26   purportedly because children and other relatives wanted to keep the property intact in the family.

27       35.    On May 9, 2011, GOLDMAN wrote to YOUNG proposing that the parties enter
28   into a land lease for the subject 12 acres to remain in force as long as KONGSGAARD owned 550

STONECREST.  On May 17, 2011, GOLDMAN e-mailed the new offer to YOUNG.  GOLDMAN threatened that if PLAINTIFFS did not accept the new offer, he and his wife, KONGSGAARD, would erect a fence along their property line to cut off PLAINTIFFS' access to their hillside terraces and gravel pathways on which they claimed to have an easement and which they had maintained for decades when KONGSGAARD had failed to take any measures to protect against the fire, erosion, and rockslide hazards posed by the property.  This fence across the north-east hillside would prevent maintenance of terraces, fire trails, drainage collection, gravel "dry zone" pathways, irrigated planting beds, which PLAINTIFFS built to protect their house, family and the neighborhood.

36.  On May 25, 2011, YOUNG responded to GOLDMAN's letter on by trying to work out an amicable resolution that would allow PLAINTIFFS to complete their purchase of the property.  She offered to complete the purchase of the 12 acres on the terms of the AGREEMENT, while waiving the Williamson Act and reappraisal contingencies.  YOUNG also proposed mediation if they could not resolve their differences and move forward with the transaction.

37.  When PLAINTIFFS did not accept GOLDMAN'S new offer, KONGGAARD and GOLDMAN hired land use attorneys to opine that PLAINTIFFS may have breached the Williamson Act by making recreational improvements not associated with a residence on 550 STONECREST which created a cloud on the KONGSGAARD's title.  The attorneys hired by KONGSGAARD and GOLDMAN threatened that PLAINTIFFS' breach would result in recapture of tax assessments and imposition of penalties.  On June 23, 2011, KONGSGAARD and GOLDMAN sent their attorney's letter along with a new demand to PLAINTIFFS and gave them seven days to agree to the new terms, threatening to sue if they refused to agree to settle.

38.  On June 28, 2011, KONGSGAARD, along with co-owners Mary and John Kongsgaard, entered into Napa County Agricultural Preserve Type "H" Contract No. P11-00021-AGK.  The contract rescinded and replaced the existing Williamson Act contract, adjusted the lot line between two parcels and prevented transfer of the 12-acre portion of 550 STONECREST. KONGSGAARD did not reveal the breach mentioned by their land use attorneys that was allegedly in violation of the Williamson Act in their new application for a Napa County

Agricultural Preserve Contract.

39.    On July 1, 2011, YOUNG wrote to GOLDMAN that PLAINTIFFS would be willing to take the land subject to the Williamson Act and to let the Williamson Act expire.  She wrote, "*I understood from Mary and Dick back in the fall of 2010 that the notices of termination were filed for the 550 parcel, so the contracts have another 8 years to run.  Please let me know if this is not accurate… So we are willing to purchase subject to the Williamson Act.*"

40.    On July 6, 2011, GOLDMAN sent an email to YOUNG stating that they could not sell them  the land with the Williamson Act in place.  He suggested that the "only" way to proceed was for KONGSGAARD to sell a smaller portion of land to PLAINTIFFS and for PLAINTIFFS to finance all of KONGSGAARD's "soft costs" and costs to process the Williamson Act cancellation.  GOLDMAN did not tell YOUNG that KONGSGAARD had not filed notices of termination of the Williamson Act for 550 STONECREST as she believed from their previous representations, or that they had filed an application for a new Williamson Act contract on 550 STONECREST.  Goldman did in fact confirm to Young orally that the notice of non-renewal was filed, and that was an alternative if the parties were willing to wait out the 9 years.

41.    In August 2011, negotiations continued with a preliminary understanding of a six-step process for a sale of 10.5 acres, which GOLDMAN later gutted with a term sheet providing that all provisions were non-binding except for a lease of the property terminable by a 30-day notice.

42.    KONGSGAARD, GOLDMAN, and PLAINTIFFS then entered into a tolling agreement.  The purpose of the agreement was to toll any statute of limitations as the terms requested by GOLDMAN and KONGSGAARD kept changing.  PLAINTIFFS also viewed the tolling agreement as a "Plan B."  Under the terms of the Williamson Act contract, all restrictions imposed on the property by the Act would terminate nine years after a notice of termination was filed.  PLAINTIFFS understood from GOLDMAN and Mary Kongsgaard that notices of termination had been filed such that the Williamson Act restrictions would have terminated at the end of 2019; however, unbeknownst to PLAINTIFFS, no such notices had been filed, or if filed, were replaced by the new Williamson Act contract.

43.   In October 2011, GOLDMAN informed PLAINTIFFS of a pending 1031 tax-free transfer between Mary Kongsgaard and MARTHA KONGSGAARD, which would delay PLAINTIFFS' purchase until 2013.  PLAINTIFFS informed GOLDMAN that they were willing to wait until 2013 to complete the purchase.

**III.   Kongsgaard Engages in Negotiations to Sell the Same Parcel of Property to Czap**

44.   On November 18, 2012, KONGSGAARD initiated negotiations with CZAP regarding his purchase of a portion of the same parcel of property—550 STONECREST—that was the subject of her negotiations with PLAINTIFFS.  The terms of these negotiations included canceling the Williamson Act and a long-term lease arrangement, both of which GOLDMAN had told PLAINTIFFS were impossible under the law.

45.   While KONGSGAARD and GOLDMAN were negotiating with CZAP in January 2013 for the purchase of approximately 8 acres at a lower price than PLAINTIFFS had agreed to pay, GOLDMAN and KONGSGAARD told PLAINTIFFS they would sell them only 1.5 to 2 acres because their children and other family members wanted to keep the property intact.

46.   On December 20, 2013, MARTHA KONGSGAARD purchased Mary Kongsgaard's interest in 550 STONECREST, becoming the sole owner of the property.

47.   On October 28, 2017, CZAP wrote to KONGSGAARD that he "*still would like to purchase the property warts and all and just deal with Wang myself....*"  (KONGSGAARD 00074-00076, marked as Exhibit E).

48.   On January 20, 2018, he again wrote to KONGSGAARD, with his offer to purchase the property at a lower price than PLAINTIFFS agreed to pay and to "deal with Wang." (CZAP 000223, marked as Exhibit F).

49.   On January 29, 2018, GOLDMAN sent a proposal to CZAP that would allow CZAP to purchase up to 12 acres.  One of the points for discussion stated "*Wangs.  We will need to discuss the right approach to them.  FYI.*"  CZAP was aware of GOLDMAN and KONGSGAARDS' negotiations with PLAINTIFFS and the tolling agreement.  As part of CZAP's agreement to "deal with Wang," he and KONGSGAARD and GOLDMAN would split any profit from CZAP's sale of property to PLAINTIFFS.  This bounty arrangement, and CZAP's related agreement to "deal

with Wang" continued the refusal by the Kongsgaard to honor their commitment to sell the property to the Wangs as they sought a more "suitable" (i.e. Caucasian) purchaser.   This culminated in a  sustained, racially motivated campaign by DEFENDANTS to drive PLAINTIFFS out of their home and out of the neighborhood and the county.

**IV.    Defendants Engage in a Racially Motivated Campaign to Drive Plaintiffs Out of Their Home and to Preserve the "Heritage" of the Neighborhood**

50.    With KONGSGAARD and GOLDMAN's incitement, collaboration and encouragement, CZAP began a campaign of harassment, intimidation, defamation, and threats against PLAINTIFFS.

51.    PELETTA soon joined in the campaign in 2018 with the incitement, collaboration and encouragement of KONGSGAARD, GOLDMAN, and CZAP.   He also was aware of PLAINTIFFS' negotiations to purchase a portion of 550 STONECREST from KONGSGAARD and the tolling agreement between the parties.

52.    In 2018, a survey commissioned by PELETTA showed that a small percentage of PLAINTIFFS' fire trail system with supporting retaining wall crossed over onto PELETTA's property at 440 STONECREST and that, contrary to the common understandings of PLAINTIFFS, the real estate broker, and the previous owners of 440 STONECREST, as well as PELETTA at the time he purchased the property in 2013, the property boundary was not the fence line.   PELETTA rebuffed PLAINTIFFS' efforts to resolve the issue amicably, instead seizing on the issue.   He bragged to CZAP that he was going to extract "an insane amount of money" from PLAINTIFFS and was welcomed into CZAP, KONGSGAARD, and GOLDMAN's campaign of harassment, intimidation, defamation, and threats against PLAINTIFFS to further his belief in preserving the "heritage" of the neighborhood.   (CZAP 000243, marked as Exhibit G).

53.    On or about March 6, 2018, KONGSGAARD, by and through the actions of her co-conspirator, CZAP, intentionally, and without notice or permission, entered onto PLAINTIFFS' property cutting down and removing trees and bushes which were wholly or in part, on 460 STONECREST in violation of California Civil Code § 3346(a) as well as California Code of Civil Procedure §§ 733 and 734.

54.    At no time did PLAINTIFFS grant KONGSGAARD, GOLDMAN, or CZAP permission to enter their property, take photographs or damage or cut down their trees and bushes.

55.    PLAINTIFFS allege on information and belief that KONGSGAARD, GOLDMAN, and CZAP conspired to falsely inform residents of the Stonecrest neighborhood that PLAINTIFFS had breached a water pump agreement which serves the uphill neighbors and is on the 460 property.  The Wangs have maintained the pump and paid for the electricity which they would periodically disburse pro rata to the neighbors.  They have done this without recompense other than shared expenses for over 25 years.  KONGSGAARD, GOLDMAN, and CZAP presented an unsigned and undated water pump agreement in lieu of the recorded Water Pump Lease signed by PLAINTIFFS' and DEFENDANTS' predecessors on July 8, 1965.  PELETTA also claimed rights under the "phony" water pump agreement.  The 440 property was never a party to the pump agreement.  His property sits below the pump.

56.    On July 5, 2018, CZAP, claiming to be a "concerned citizen" with the knowledge and approval of KONGSGAARD, GOLDMAN and PELETTA filed a Nuisance Abatement Complaint with the County of Napa Code Enforcement Division regarding PLAINTIFFS' 460 STONECREST property which stated**:** *"illegal building, grading without permit, illegal construction, concern for drainage runoff.  Conditions have existed for over 10 years. Currently they are working . . ."*

57.    On July 24, 2018, CZAP with the knowledge and approval of KONGSGAARD, sent an email to Napa County Building Inspector Gregory Baxter copying DEFENDANTS stating in pertinent part:  *"Thank you for the follow through visit this morning. As I said to you, Martha has given me permission to walk anywhere on her property to perform work to lessen fire danger as well as for any reason that is beneficial to her interest. [portions omitted]  I have no problem running point with Wang, it would be fun. I have dealt with attorneys, judges and government officials for many years, including helping the FDA on some projects so this is really not hard."* (KONGSGAARD 00041, marked as Exhibit H).

58.    On September 26, 2018, PELETTA and CZAP with the knowledge and approval of KONGSGAARD and GOLDMAN, requested and made an appointment for a site inspection of

460 STONECREST by the California Department of Fish and Wildlife (DFW) and the San Francisco Bay Regional Water Quality Control Board (WQCB): *"to explore the possibility of environmental damage caused by Wang's discharge, run-off into the creek, soil erosion, use of hazardous chemicals, weed, and deer repellants."* KONGSGAARD gave the DFW and WQCB permission to have access onto her land for the purpose of investigating PLAINTIFFS' alleged violations.

59.   CZAP continually interfered with the work of PLAINTIFFS' gardeners, trespassed without PLAINTIFFS' permission or consent, and kept PLAINTIFFS' property under surveillance, stalking PLAINTIFFS, taking photographs and intimidating the gardeners whom he referred to as "illegal Mexicans".

60.   Communications by and between KONGSGAARD, GOLDMAN, CZAP, and PELETTA disparage PLAINTIFFS using racially derogatory terms which employ racial stereotypes including malicious comments in furtherance of their conspiratorial acts.

61.   On March 28, 2019, CZAP instigated a confrontation with PLAINTIFF Wang, moving towards him aggressively within about 3 feet, and making express DEFENDANTS' goal of forcing PLAINTIFFS to leave the neighborhood, stating, "*We're going to kick you chinks off this hill and drive you out of the county. We have the whole neighborhood against you and we have the county against you.*" He also said, "*I'm tired of seeing your illegal Mexicans out by your gate every morning.*" (WANG 02488, marked as Exhibit I).

62.   CZAP acted with full permission from KONGSGAARD, GOLDMAN and PELETTA to serve their interests. He communicated with KONGSGAARD, GOLDMAN and PELETTA on actions he took with respect to PLAINTIFFS, their property, and his efforts to have PLAINTIFFS cited for claimed legal violations, including giving a guided tour of their properties for state, regional and local enforcement agencies. KONGSGAARD, GOLDMAN, and PELETTA accepted and acquiesced to his racist slurs.

63.   PELETTA also engaged in confrontations with PLAINTIFFS. He screamed at PLAINTIFFS and made obscene gestures when he saw them in the neighborhood, even in the presence of their daughter who was returning from the hospital. He proudly asserted that he told

anyone who walked along Stonecrest Drive by his home about PLAINTIFFS' purported trespass, unlawful acts, and lack of ethics.  On information and belief, he also commissioned neighborhood meetings about the "Great Wall of Wang" and tried to convince a variety of officials to pursue both criminal and administrative charges against PLAINTIFFS purportedly based on the encroachment of PLAINTIFFS' fire trail system that had been in place for over 20 years and with which he had never previously taken an interest or expressed any concern.

64.     In e-mail communications, PELETTA urged County of Napa code compliance officers to take action against PLAINTIFFS using racial stereotypes of the "untrustworthy, sneaky Oriental" to make his case.  PELETTA wrote: *PLAINTIFFS "lie under oath," "cheat," evade taxes, "operate above the law with willful disregard of the law and common good," "promote the underground economy and simply cannot be trusted," and that "Wang does not have any ethics or scruples,"* among other derogatory comments and claims of unlawful conduct. He encouraged Napa County to take criminal action against WANG for code violations.   These e-mail communications were shared with CZAP, GOLDMAN, and KONGSGAARD.  (CZAP 000074-000076, marked as Exhibit J).

65.     On March 28, 2019, in an exchange of emails between GOLDMAN and CZAP, GOLDMAN called WANG "*a complete basket case,*" and stated that PLAINTIFF "*Wang is facing the expenditure of millions of dollars and is going to watch his little castle grounds be dismantled piece-by-piece. We will set up lawn chairs on Martha's property to watch the show!*" (KONGSGAARD 00260, marked as Exhibit K).

66.     On March 29, 2019 in an exchange of emails between KONGSGAARD and CZAP, CZAP characterized PLAINTIFFS as "*Chinese Mafia.*"   KONGSGAARD concurred in this characterization, writing: "*don't get yourself killed*". (KONGSGAARD 00254-00255, marked as Exhibit L).

67.     On multiple occasions in the spring of 2019, CZAP made obscene gestures and raced his car toward PLAINTIFFS, family members, and employees in a threatening manner.

68.     On or about September 13, 2018, PELETTA wrote to Gregory Baxter, the Code Compliance Officer for Napa County in charge of the code enforcement case no. CE18-00201

1  requesting an extension of 45 days to respond. Therein PELETTA advised that "*in future*

2  *correspondences, I may reference GWOW (Great Wall of Wang) my project name for the clean-*

3  *up and remediation effort".* (PELETTA 0441, marked as Exhibit M).

4        69.    On or about September 26, 2018 and monthly until January 17, 2019, PELETTA in

5  meetings hosted at his home prepared a power point presentation titled*: "GWOW Project Status*

6  *Report." The acronym stands for "The Great Wall of Wang."* (PELETTA 0406, 0432 and 0433

7  marked as Exhibit N).  The power point presentation lists the participants as including various

8  members of the community and local and state government agencies.

9        70.    PELETTA and CZAP have continued to verbally express racial slurs and refer to

10  PLAINTIFFS and their property in racially derogatory terms in emailed communications copied

11  to KONGAGAARD and GOLDMAN and others, including references to the *"Great Wall of*

12  *Wang"* and allegations of crimes including failure to pay taxes, insurance fraud, disregard of

13  immigration laws and building, water, and fish and wildlife code violations.  On December 5,

14  2018, CZAP wrote that he wished he "had some rude Great Wall tee shirt to wear" when work

15  was being done on 440 STONECREST, and he expressed on multiple occasions how "fun" he

16  found his campaign against PLAINTIFFS.  KONGSGAARD wrote to CZAP on March 21, 2018,

17  "They are that bad but I also know you're terribly malicious, Mr. Czap!!!"  (KONGSGAARD

18  000554, marked as Exhibit O).  KONGSGAARD stated that she was satisfied with Czap's actions,

19  "I greatly appreciate his cooperation and transparent communications with me."  (Kongsgaard

20  000319, marked as Exhibit P)

21        71.    DEFENDANTS' conduct was in furtherance of their racially-motivated conspiracy

22  to intimidate PLAINTIFFS, deprive them of their property rights, cause them severe emotional

23  distress, and ultimately to drive them out of their home and out of the neighborhood and county.

24        72.    In February 2019, KONGSGAARD filed a lawsuit against PLAINTIFFS in

25  California Superior Court to deny them any ownership or easement right to any part of 550

26  STONECREST.  Days later, PELETTA and CZAP constructed a spite fence along the boundary

27  between 440 STONECREST and 460 STONECREST to block PLAINTIFFS' access to their

28  easement on 440 STONECREST.

**FIRST CAUSE OF ACTION**
**(Racial Discrimination in the Making or Enforcement of Contract**
**Against Martha Kongsgaard and Peter Goldman)**

73.    PLAINTIFFS incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

74.    PLAINTIFFS are United States citizens of the Asian race and Chinese descent who were denied the same rights as enjoyed by white citizens of the United States to make or enforce a contract to purchase real property.

75.    DEFENDANTS' discrimination against PLAINTIFFS is in violation of PLAINTIFFS' rights afforded them by the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

76.    PLAINTIFFS understood that the July 8, 2010 letter AGREEMENT was a binding contract that obligated them to purchase and KONGSGAARD to sell the 12-acre parcel of 550 STONECREST to them (as noted, the parties' obligations under the Agreement was and is the subject of proceedings in the state court).  KONGSGAARD and GOLDMAN did not inform PLAINTIFFS that KONGSGAARD did not consider it binding and enforceable, and that they would not enter into a binding and enforceable contract with PLAINTIFFS, until many months after the Kongsgaards had accepted PLAINTIFFS' $7500 payment.   GOLDMAN and KONGSGAARD continued to string PLAINTIFFS along with changing terms and proposals to sell them portions of 550 STONECREST, leading PLAINTIFFS to believe that KONGSGAARD and GOLDMAN would sell PLAINTIFFS 12 acres of 550 STONECREST either by honoring the July 8th Agreement or by entering into a new contract with PLAINTIFFS.

77.    PLAINTIFFS at all times were and still are ready, willing, and able to perform their promises and conditions offered and agreed to in their contract negotiations with KONGSGAARD and GOLDMAN.

78.    KONGSGAARD and GOLDMAN refused to enter into, make, or enforce a contract with PLAINTIFFS for the sale of any portion of 550 STONECREST.  Rather than negotiate in good faith with PLAINTIFFS, and move forward with the sale of the 12 acres reflected in the AGREEMENT or enter into a purchase agreement they agreed in writing was binding,

19

1   KONGSGAARD intentionally entered into a new Williamson Act agreement with Napa County

2   in June 2011.   KONGSGAARD and GOLDMAN strung PLAINTIFFS along with changing

3   demands and scare tactics.  KONGSGAARD and GOLDMAN waited until January 2013 to inform

4   PLAINTIFFS that they would not sell PLAINTIFFS any portion of the 550 STONECREST

5   PROPERTY except the area occupied by PLAINTIFF's improvements.  KONGSGAARD sued

6   PLAINTIFFS in California Superior Court in 2019 to deny PLAINTIFFS any ownership or

7   easement right to any part of 550 STONECREST (the "State Court Case").  PLAINTIFFS filed a

8   cross-complaint seeking to secure their ownership or easement rights.

9        79.   On information and belief, KONGSGAARD and GOLDMAN, between November

10   18, 2012 and the present, engaged in negotiations with CZAP regarding his potential purchase of

11   the same portion of 550 STONECREST that was the subject of the AGREEMENT and which

12   PLAINTIFFS sought to purchase but KONGSGAARD and GOLDMAN refused to sell to them.

13        80.   With GOLDMAN and KONGSGAARD's encouragement and participation, CZAP

14   and PELETTA engaged in intentional acts to prevent PLAINTIFFS from entering, making, and

15   enforcing a contract to purchase a portion of 550 STONECREST from KONGSGAARD and

16   GOLDMAN.   Their acts included a campaign of harassment and intimidation, with obscene

17   gestures, threats, defamation, property destruction, and stalking among the actions aimed at

18   PLAINTIFFS.   CZAP and PELETTA aimed to have the property sold to CZAP rather than

19   PLAINTIFFS, to drive PLAINTIFFS out of their home, and to deny them the benefits of entering,

20   making, and enforcing a contract to purchase land adjacent to their home which they had taken

21   care of for over 30 years.

22        81.   KONGSGAARD AND GOLDMAN refused to enter into, make, or enforce a

23   contract with PLAINTIFFS for their purchase of a portion of 550 STONECREST.  On information

24   and belief, if not for PLAINTIFFS' Asian race and Chinese descent, KONGSGAARD and

25   GOLDMAN would have entered into, made, and enforced such a contract and allowed

26   PLAINTIFFS the benefits, privileges, terms, and conditions thereof, and CZAP and PELETTA

27   would not have impeded PLAINTIFFS' ability to enter into, make, and enforce such a contract

28   and would have allowed PLAINTIFFS the benefits, privilege, terms, and conditions thereof.

82.     By the conduct alleged herein, KONGSGAARD and GOLDMAN intentionally deprived PLAINTIFFS of the same rights as are enjoyed by white United States citizens to make and enforce contracts and to enjoy all benefits, privileges, terms, and conditions of the contractual relationship.

83.     As a result of KONGSGAARD and GOLDMAN's discrimination in violation of 42 U.S.C. §1981, PLAINTIFFS have been denied the right to make, enforce, and enjoy the benefits, privileges, terms, and conditions of a contract to purchase property adjacent to their home. PLAINTIFFS have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of KONGSGAARD and GOLDMAN's actions, thereby entitling them to compensatory damages.

84.     In their discriminatory actions, KONGSGAARD and GOLDMAN acted with malice or conscious and deliberate disregard for the rights of PLAINTIFFS, thereby entitling them to an award of punitive damages.

85.     WHEREFORE, to remedy the violations of PLAINTIFFS' rights secured by Section 1981, PLAINTIFFS pray for judgment against KONGSGAARD and GOLDMAN as hereinafter set forth.

**SECOND CAUSE OF ACTION**
**(Racial Discrimination in the Making or Enforcement of Contract**
**Against Al Czap and Brian Peletta)**

86.     PLAINTIFFS incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

87.     PLAINTIFFS are United States citizens of the Asian race and Chinese descent who were denied the same rights as enjoyed by white citizens of the United States to make or enforce a contract to purchase real property.

88.     DEFENDANTS' discrimination against PLAINTIFFS is in violation of PLAINTIFFS' rights afforded them by the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

89.     PLAINTIFFS understood that the July 8, 2010 letter AGREEMENT was a binding contract that obligated them to purchase and KONGSGAARD to sell the 12-acre parcel of 550

1  STONECREST to them (as noted, the parties' obligations under the Agreement was and is the

2  subject of proceedings in the state court).   KONGSGAARD and GOLDMAN did not inform

3  PLAINTIFFS that KONGSGAARD did not consider it binding and enforceable, and that they

4  would not enter into a binding and enforceable contract with PLAINTIFFS, until many months

5  after the Kongsgaards had accepted PLAINTIFFS' $7500 payment.   GOLDMAN and

6  KONGSGAARD continued to string PLAINTIFFS along with changing terms and proposals to

7  sell them portions of 550 STONECREST, leading PLAINTIFFS to believe that KONGSGAARD

8  and GOLDMAN would sell PLAINTIFFS 12 acres of 550 STONECREST either by honoring the

9  July 8th Agreement or by entering into a new contract with PLAINTIFFS.

10      90.   PLAINTIFFS at all times were and still are ready, willing, and able to perform their

11  promises and conditions offered and agreed to in their contract negotiations with KONGSGAARD

12  and GOLDMAN.

13      91.   KONGSGAARD and GOLDMAN refused to enter into, make, or enforce a contract

14  with PLAINTIFFS for the sale of any portion of 550 STONECREST.   Rather than negotiate in

15  good faith with PLAINTIFFS, and move forward with the sale of the 12 acres reflected in the

16  AGREEMENT or enter into a purchase agreement they agreed in writing was binding,

17  KONGSGAARD intentionally entered into a new Williamson Act agreement with Napa County

18  in June 2011.   KONGSGAARD and GOLDMAN strung PLAINTIFFS along with changing

19  demands and scare tactics. KONGSGAARD and GOLDMAN waited until January 2013 to inform

20  PLAINTIFFS that they would not sell PLAINTIFFS any portion of the 550 STONECREST

21  PROPERTY except the area occupied by PLAINTIFF's improvements.   KONGSGAARD sued

22  PLAINTIFFS in California Superior Court in 2019 to deny PLAINTIFFS any ownership or

23  easement right to any part of 550 STONECREST (the "State Court Case").   PLAINTIFFS filed a

24  cross-complaint seeking to secure their ownership or easement rights.

25      92.   On information and belief, KONGSGAARD and GOLDMAN, between November

26  18, 2012 and the present, engaged in negotiations with CZAP regarding his potential purchase of

27  the same portion of 550 STONECREST that was the subject of the AGREEMENT and which

28  PLAINTIFFS sought to purchase but KONGSGAARD and GOLDMAN refused to sell to them.

93.     With GOLDMAN and KONGSGAARD's encouragement and participation, CZAP and PELETTA engaged in intentional acts to interfere with PLAINTIFFS' contractual relationship, including their entering, making, and enforcing a contract, to purchase a portion of 550 STONECREST from KONGSGAARD and GOLDMAN.  Their acts included a campaign of harassment and intimidation, with obscene gestures, threats, defamation, property destruction, and stalking among the actions aimed at PLAINTIFFS.  CZAP and PELETTA aimed to have the property sold to CZAP rather than PLAINTIFFS, to drive PLAINTIFFS out of their home, and to deny them the benefits of entering, making, and enforcing a contract to purchase land adjacent to their home which they had taken care of for over 30 years.

94.     KONGSGAARD AND GOLDMAN refused to enter into, make, or enforce a contract with PLAINTIFFS for their purchase of a portion of 550 STONECREST.  On information and belief, if not for PLAINTIFFS' Asian race and Chinese descent, CZAP and PELETTA would not have impeded PLAINTIFFS' ability to enter into, make, and enforce such a contract and would have allowed PLAINTIFFS the benefits, privilege, terms, and conditions thereof.

95.     By the conduct alleged herein, CZAP and PELETTA intentionally deprived PLAINTIFFS of the same rights as are enjoyed by white United States citizens to make and enforce contracts and to enjoy all benefits, privileges, terms, and conditions of the contractual relationship.

96.     As a result of CZAP and PELETTA's discrimination in violation of 42 U.S.C. §1981, PLAINTIFFS have been denied the right to make, enforce, and enjoy the benefits, privileges, terms, and conditions of a contract to purchase property adjacent to their home.  PLAINTIFFS have suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of CZAP and PELETTA's actions, thereby entitling them to compensatory damages.

97.     In their discriminatory actions, CZAP and PELETTA acted with malice or conscious and deliberate disregard for the rights of PLAINTIFFS, thereby entitling them to an award of punitive damages.

98.     WHEREFORE, to remedy the violations of PLAINTIFFS' rights secured by Section 1981, PLAINTIFFS pray for judgment against CZAP and PELETTA as hereinafter set forth.

### THIRD CAUSE OF ACTION
**(Racial Discrimination in the Sale and Holding of Real Property
Against Martha Kongsgaard and Peter Goldman)**

99.   PLAINTIFFS incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

100.   DEFENDANTS' discrimination against PLAINTIFFS is in violation of the rights of PLAINTIFFS afforded to them by the Civil Rights Act of 1866, 42 U.S.C. § 1982.

101.   PLAINTIFFS are United States citizens of the Asian race and Chinese descent who were denied the same rights as enjoyed by white citizens of the United States to make or enforce a contract to purchase real property.

102.   PLAINTIFFS offered and negotiated with GOLDMAN and KONGSGAARD to buy a 12-acre portion of 550 STONECREST.

103.   KONGSGAARD and GOLDMAN even after signing the AGREEMENT and accepting money as consideration for the obligation, engaged in sham negotiations with PLAINTIFFS, changing the terms and demands, entering into an agreement they did not consider binding without informing PLAINTIFFS, and ultimately refusing to sell the property to PLAINTIFFS.   On information and belief, the 12-acre parcel remained available for sale after KONGSGAARD refused to sell the property to PLAINTIFFS.   At the same time KONGSGAARD and GOLDMAN told PLAINTIFFS that they would sell them only 1.5 to 2 acres, they were negotiating to sell the 12 acres at a lower price to CZAP, a Caucasian man.

104.   PLAINTIFFS claim easement rights over approximately 1.39 acres on the 550 STONECREST property where they have made improvements and constructed fire trails. PLAINTIFFS' easement rights include the right to continue to maintain the improvements in place, use the fire trails to remove dead trees, shrubs, and tall weeds and grass that present a fire danger in the vicinity of the fire trails, maintain the area for purposes of fire prevention, erosion control, social use and entertainment, and gardening.

105. Beginning in 2017, KONGSGAARD directed CZAP, with GOLDMAN's incitement, collaboration and encouragement, to interfere with the maintenance of a water pump on 460 STONECREST, interfere with the work of PLAINTIFFS' gardeners in the easement area

24

of 550 STONECREST, strip out trees and plantings which provided cover on the front of their property and for the water pump and tank from the road on and near the front of 460 STONECREST, trespass onto 460 STONECREST without permission or consent and to take photographs, stalk PLAINTIFFS and engage in a pattern and practice of intimidation and harassment intended to deprive PLAINTIFFS of quiet enjoyment of their property.  CZAP and PELETTA have engaged in intimidation and harassment of PLAINTIFFS in order to drive them out of the neighborhood and the county.

106.   DEFENDANTS' discriminatory conduct was expressly designed to drive PLAINTIFFS out of their home and rightful possession of the disputed easement on 550 STONECREST.

107.   On information and belief, if not for PLAINTIFFS' Asian race and Chinese descent, KONGSGAARD would have sold the 12-acre parcel of 550 STONECREST to PLAINTIFFS pursuant to the terms negotiated in the AGREEMENT and she and GOLDMAN would not have attempted to drive PLAINTIFFS from their home.

108.   By the conduct described above, KONGSGAARD and GOLDMAN intentionally deprived PLAINTIFFS of the same rights as are enjoyed by white United States citizens to purchase and hold real property.

109.   As a result of KONGSGAARD and GOLDMAN's discrimination in violation of 42 U.S.C. § 1982, PLAINTIFFS have been denied the right to purchase and hold real property. PLAINTIFFS have suffered the loss of personal property and the fruits of their labor, anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of KONGSGAARD and GOLDMAN's actions, thereby entitling them to compensatory damages.

110.   In the discriminatory actions as alleged above, KONGSGAARD and GOLDMAN acted with malice or conscious and deliberate disregard for the rights of PLAINTIFFS, thereby entitling them to an award of punitive damages.

111.   WHEREFORE, to remedy the violations of PLAINTIFFS' rights secured by Section 1982, PLAINTIFFS pray for judgment against KONGSGAARD and GOLDMAN as hereinafter set forth.

**FOURTH CAUSE OF ACTION**
**(Racial Discrimination in the Sale and Holding of Real Property**
**Against Al Czap and Brian Peletta)**

112.   PLAINTIFFS incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

113.   DEFENDANTS' discrimination against PLAINTIFFS is in violation of the rights of PLAINTIFFS afforded to them by the Civil Rights Act of 1866, 42 U.S.C. § 1982.

114.   PLAINTIFFS are United States citizens of the Asian race and Chinese descent who were denied the same rights as enjoyed by white citizens of the United States to make or enforce a contract to purchase real property.

115.   PLAINTIFFS offered and negotiated with GOLDMAN and KONGSGAARD to buy a 12-acre portion of 550 STONECREST.  KONGSGAARD ultimately refused to sell the property to PLAINTIFFS.  At the same time KONGSGAARD and GOLDMAN told PLAINTIFFS that they would sell them only 1.5 to 2 acres, they were negotiating to sell the 12 acres at a lower price to CZAP, a Caucasian man.

116.   PLAINTIFFS claim easement rights over approximately 2.6 acres on the 550 STONECREST property where they have made improvements and constructed fire trails. PLAINTIFFS' easement rights include the right to continue to maintain the improvements in place, use the fire trails to remove dead trees, shrubs, and tall weeds and grass that present a fire danger in the vicinity of the fire trails, maintain the area for purposes of fire prevention, erosion control, social use and entertainment, and gardening.

117.   With GOLDMAN and KONGSGAARD's encouragement and participation, CZAP and PELETTA engaged in intentional acts to interfere with PLAINTIFFS' ability to purchase and hold real property.  Their acts included a campaign of harassment and intimidation, with obscene gestures, threats, defamation, property destruction, and stalking among the actions aimed at PLAINTIFFS.  CZAP and PELETTA aimed to have the property sold to CZAP rather than PLAINTIFFS, to drive PLAINTIFFS out of their home, and to deny them the benefits of entering, making, and enforcing a contract to purchase land adjacent to their home and the benefits of holding real property, including their home at 460 STONECREST and their easement on 550

26

STONECREST.  Since 2017, CZAP has interfered with the maintenance of a water pump on 460 STONECREST, interfered with the work of PLAINTIFFS' gardeners in the easement area of 550 STONECREST, stripped out trees and plantings which provided cover on the front of their property and for the water pump and tank from the road on and near the front of 460 STONECREST, trespassed onto 460 STONECREST without permission or consent and to take photographs, stalked PLAINTIFFS and engaged in a pattern and practice of intimidation and harassment intended to deprive PLAINTIFFS of quiet enjoyment of their property.  PELETTA also engaged in confrontations with PLAINTIFFS, which included screaming at PLAINTIFFS, making obscene gestures at them, holding neighborhood meetings about what he derisively called the "Great Wall of Wang," and, again using racial stereotypes, worked to persuade government officials to take criminal and administrative enforcement action against PLAINTIFFS.  CZAP and PELETTA engaged in such intimidation and harassment of PLAINTIFFS in order to drive them out of the neighborhood and the county.

118.  DEFENDANTS' discriminatory conduct was expressly designed to drive PLAINTIFFS out of their home and rightful possession of the disputed easement on 550 STONECREST and to deny them the opportunity to purchase a portion of 550 STONECREST.

119.  CZAP and PELETTA's attempts to drive PLAINTIFFS off their property and out of the neighborhood are ongoing and continue to this day.  On information and belief, if not for PLAINTIFFS' Asian race and Chinese descent, CZAP and PELETTA would not have attempted to drive PLAINTIFFS from their home or deprive them of the rights to purchase and hold real property.

120.  By the conduct described above, CZAP and PELETTA intentionally deprived PLAINTIFFS of the same rights as are enjoyed by white United States citizens to hold and purchase real property.

121.  As a result of CZAP and PELETTA's discrimination in violation of 42 U.S.C. § 1982, PLAINTIFFS have been denied the right to purchase and hold real property.  PLAINTIFFS have suffered the loss of personal property and the fruits of their labor, anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of CZAP and PELETTA's actions,

thereby entitling them to compensatory damages.

122.   In the discriminatory actions as alleged above, CZAP and PELETTA acted with malice or conscious and deliberate disregard for the rights of PLAINTIFFS, thereby entitling them to an award of punitive damages.

123.   WHEREFORE, to remedy the violations of PLAINTIFFS' rights secured by Section 1982, PLAINTIFFS pray for judgment against CZAP and PELETTA as hereinafter set forth.

### FIFTH CAUSE OF ACTION
### (Conspiracy to Deprive Equal Protection Under the Laws Against Martha Kongsgaard)

124.   PLAINTIFFS incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

125.   As described more fully above, KONGSGAARD conspired, directly and indirectly, for the purpose of depriving PLAINTIFFS of equal protection under the laws.  In particular, KONGSGAARD conspired to deny PLAINTIFFS the same rights as enjoyed by white citizens to make and enforce a contract to purchase real property, to purchase and hold real property and quiet enjoyment of the same. KONGSGAARD's conspiracy was motivated by racial animus toward PLAINTIFFS because of their Asian race and Chinese descent.

126.   KONGSGAARD took actions in furtherance of this conspiracy, causing injury to PLAINTIFFS. KONGSGAARD coordinated with the other DEFENDANTS to deprive PLAINTIFFS of equal protection of the law in their use and enjoyment of their easement and 460 STONECREST and their ability to purchase real property adjacent to their home.

127.   CZAP communicated with and acted at the direction of KONGSGAARD concerning his interference with the work of PLAINTIFFS' gardeners, his removal of trees and plantings which provided cover from the road on and near the front of the property, his trespass on PLAINTIFFS' property to take photographs, stalking of PLAINTIFFS, ongoing surveillance of PLAINTIFFS' property, and efforts to subject PLAINTIFFS to investigation and citation by the Napa County Planning, Building and Environmental Services Department, Engineering Division, USDA Natural Resources Conservation Service and California Department of Fish and Wildlife and for alleged regulatory violations on 460 STONECREST as described more fully above, and

he received supportive responses from Defendants.  In communications with KONGSGAARD about these actions, CZAP showed racial animus for DEFENDANTS' conspiracy by using racial stereotypes and racially charged terms to refer to PLAINTIFFS.  For example, he accused PLAINTIFFS of illegal activity, called them "Chinese Mafia," and stated his wish to wear a "rude" shirt referencing the "Great Wall of Wang."  CZAP instigated a confrontation with PLAINTIFF Wang, moving towards him aggressively within about 3 feet, and stating, "We are going to kick you chinks off this hill and drive you out of the county.  We have the whole neighborhood against you and we have the County against you."  He also said, "I'm tired of seeing your illegal Mexicans out by your gate every morning."  CZAP acted with, and informed others he acted with, full permission from KONGSGAARD to serve her interests.  He communicated with KONGSGAARD on actions he took with respect to PLAINTIFFS, their property, and his efforts to have PLAINTIFFS cited for claimed legal violations, including giving a guided tour of their properties for state, regional and local enforcement agencies.  KONGSGAARD accepted and acquiesced to his racist slurs.  KONGSGAARD stated that she was satisfied with Czap's actions, "I greatly appreciate his cooperation and transparent communications with me."  (Kongsgaard 000319, marked Exhibit P)

128.  PELETTA communicated with and acted with the support of KONGSGAARD regarding his efforts to subject PLAINTIFFS to investigation and citation by code compliance officers for the Napa County Planning, Building and Environmental Services Department, Engineering Division, USDA Natural Resources Conservation Service and California Department of Fish and Wildlife for alleged regulatory or code violations on PLAINTIFFS' property.  PELETTA showed racially discriminatory animus for DEFENDANTS' conspiracy by using racially charged terms to refer to PLAINTIFFS in his communications about these actions.  For example, in an email communication about PLAINTIFFS' alleged violations to Napa Code Compliance Officers, PELETTA encouraged them to take enforcement action against PLAINTIFFS for their alleged encroachment on both his and KONGSGAARD's land among other claimed violations and relied on racial stereotypes of the "sneaky oriental" and malicious and false allegations to support such action.  He wrote that PLAINTIFFS *"lie under oath," "cheat," evade*

taxes, "operate above the law with willful disregard of the law and common good," "promote the underground economy and simply cannot be trusted," and that "Wang does not have any ethics or scruples." (CZAP 000075-000076, marked as Exhibit J).  Over a five-month period, PELETTA prepared a monthly power point presentation with the title "GWOW Project Status Report," with "GWOW" referring to the "Great Wall of Wang."  He made the report available to members of the community and local government.  KONGSGAARD was aware of and acquiesced to his racist slurs.  PELETTA communicated with KONGSGAARD on actions he took to with respect to PLAINTIFFS, their property, and his efforts to have PLAINTIFFS cited for claimed legal violations as part of their effort to drive PLAINTIFFS out of the neighborhood.

129.   KONGSGAARD supported and communicated with CZAP and PELETTA about collective efforts to interfere with PLAINTIFFS' property and other legal rights and their racist slurs.  For example, in response to CZAP's email calling PLAINTIFFS "Chinese Mafia," KONGSGAARD replied, "Don't get yourself killed!"  In response to CZAP's email regarding PLAINTIFFS' alleged rock thievery, she wrote that the theft was not surprising.  KONGSGAARD also wrote to CZAP, "They are that bad but I also know you're terribly malicious, Mr. Czap!!!"  GOLDMAN gave permission to CZAP to publish a cease and desist letter to PLAINTIFFS' lawyer with his neighbors and called PLAINTIFFS "conspiracy theorists."  KONGSGAARD offered to pay for a survey undertaken by CZAP to interfere with PLAINTIFFS' property rights and have PLAINTIFFS cited for code violations.  KONGSGAARD provided permission to CZAP to serve her interests, including with respect to PLAINTIFFS' property and their efforts to have PLAINTIFFS cited for legal violations as part of their effort to drive PLAINTIFFS out of the neighborhood and the county.  KONGSGAARD supported such efforts by CZAP and PELETTA.  KONGSGAARD also entered into negotiations to sell the same land she had negotiated to sell to PLAINTIFFS to CZAP and, as a backup plan if their efforts to drive PLAINTIFFS out of the neighborhood failed, negotiated a bounty arrangement pursuant to which she would split the profits if CZAP sold a small portion of land to PLAINTIFFS at an extortive premium.

130.   DEFENDANTS' conspiracy is in violation of 42 U.S.C. § 1985(3).

131.   As a result of this conspiracy, PLAINTIFFS have been denied the right to make and

30

enforce contracts and purchase and hold real property, and PLAINTIFFS have suffered the loss of personal property and the fruits of their labor, anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of KONGSGAARD's actions, thereby entitling them to compensatory damages.

132.   The misconduct described in this Count was undertaken with malice or conscious and deliberate disregard for the rights of PLAINTIFFS, thereby entitling them to an award of punitive damages.

133.   WHEREFORE, to remedy the violations of PLAINTIFFS' rights, PLAINTIFFS pray for judgment against KONGSGAARD as herein set forth.

**SIXTH CAUSE OF ACTION**
**(Conspiracy to Deprive Equal Protection Under the Laws**
**Against Al Czap and Brian Peletta)**

134.   PLAINTIFFS incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

135.   As described more fully above, CZAP and PELETTA each conspired, directly and indirectly, for the purpose of depriving PLAINTIFFS of equal protection under the laws.  In particular, CZAP and PELETTA conspired to deny PLAINTIFFS the same rights as enjoyed by white citizens to make and enforce a contract to purchase real property, to purchase and hold real property and quiet enjoyment of the same.  CZAP and PELETTA's conspiracy was motivated by racial animus toward PLAINTIFFS because of their Asian race and Chinese descent.

136.   CZAP and PELETTA took actions in furtherance of this conspiracy, causing injury to PLAINTIFFS. CZAP and PELETTA each coordinated with the other DEFENDANTS to deprive PLAINTIFFS of equal protection of the law in their use and enjoyment of their easement and 460 STONECREST and their ability to purchase real property adjacent to their home.

137.   CZAP communicated with KONGSGAARD and PELETTA about his interference with the work of PLAINTIFFS' gardeners, his removal of trees and plantings which provided cover from the road on and near the front of the property, his trespass on PLAINTIFFS' property to take photographs, stalking of PLAINTIFFS, ongoing surveillance of PLAINTIFFS' property, and efforts to subject PLAINTIFFS to investigation and citation by the Napa County Planning,

31

Building and Environmental Services Department, Engineering Division, USDA Natural Resources Conservation Service and California Department of Fish and Wildlife and for alleged regulatory violations on 460 STONECREST as described more fully above, and he received supportive responses from Defendants.  In communications with KONGSGAARD and PELETTA about these actions, CZAP showed racial animus for DEFENDANTS' conspiracy by using racial stereotypes and racially charged terms to refer to PLAINTIFFS.  For example, he accused PLAINTIFFS of illegal activity, called them "Chinese Mafia," and stated his wish to wear a "rude" shirt referencing the "Great Wall of Wang."  CZAP instigated a confrontation with PLAINTIFF Wang, moving towards him aggressively within about 3 feet, and stating, "We are going to kick you chinks off this hill and drive you out of the county.  We have the whole neighborhood against you and we have the County against you."  He also said, "I'm tired of seeing your illegal Mexicans out by your gate every morning."  CZAP acted with, and informed others he acted with, full permission from KONGSGAARD and PELETTA to serve their interests.  He communicated with KONGSGAARD and PELETTA on actions he took with respect to PLAINTIFFS, their property, and his efforts to have PLAINTIFFS cited for claimed legal violations, including giving a guided tour of their properties for state, regional and local enforcement agencies.  KONGSGAARD, GOLDMAN, and PELETTA accepted and acquiesced to his racist slurs.

138.  PELETTA communicated with and acted with the support of CZAP and KONGSGAARD regarding his efforts to subject PLAINTIFFS to investigation and citation by code compliance officers for the Napa County Planning, Building and Environmental Services Department, Engineering Division, USDA Natural Resources Conservation Service and California Department of Fish and Wildlife for alleged regulatory or code violations on PLAINTIFFS' property.  PELETTA showed racially discriminatory animus for DEFENDANTS' conspiracy by using racially charged terms to refer to PLAINTIFFS in his communications about these actions.  For example, in an email communication about PLAINTIFFS' alleged violations to Napa Code Compliance Officers, PELETTA encouraged them to take enforcement action against PLAINTIFFS for their alleged encroachment on both his and KONGSGAARD's land among other claimed violations and relied on racial stereotypes of the "sneaky oriental" and malicious and false

allegations to support such action.  He wrote that PLAINTIFFS *"lie under oath," "cheat," evade taxes, "operate above the law with willful disregard of the law and common good," "promote the underground economy and simply cannot be trusted,"* and that "*Wang does not have any ethics or scruples."* (CZAP 000075-000076, marked as Exhibit J).  Over a five-month period, PELETTA prepared a monthly power point presentation with the title "*GWOW Project Status Report,*" with "*GWOW" referring to the "Great Wall of Wang."*  He made the report available to members of the community and local government.  KONGSGAARD, GOLDMAN, and CZAP were aware of and acquiesced to his racist slurs.  PELETTA communicated with KONGSGAARD and CZAP on actions he took to with respect to PLAINTIFFS, their property, and his efforts to have PLAINTIFFS cited for claimed legal violations as part of their effort to drive PLAINTIFFS out of the neighborhood.

139.   DEFENDANTS' conspiracy is in violation of 42 U.S.C. § 1985(3).

140.   As a result of this conspiracy, PLAINTIFFS have been denied the right to make and enforce contracts and purchase and hold real property, and PLAINTIFFS have suffered the loss of personal property and the fruits of their labor, anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of CZAP and PELETTA's actions, thereby entitling them to compensatory damages.

141.   The misconduct described in this Count was undertaken with malice or conscious and deliberate disregard for the rights of PLAINTIFFS, thereby entitling them to an award of punitive damages.

142.   WHEREFORE, to remedy the violations of PLAINTIFFS' rights, PLAINTIFFS pray for judgment against CZAP and PELETTA as herein set forth.

### SEVENTH CAUSE OF ACTION
**(Failure to Prevent Conspiracy to Deprive Equal Protection Under the Laws Against Peter Goldman)**

143.   PLAINTIFFS incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

144.   GOLDMAN was aware of the conspiracy in violation of 42 U.S.C. § 1985 by KONGSGAARD, CZAP and PELETTA and had the power to prevent or aid in preventing the

1  commission of acts in support of the conspiracy and neglected to prevent or aid in preventing such
2  acts.

3       145.   GOLDMAN's failure to prevent or aid in preventing acts in furtherance of the
4  conspiracy was motivated by racial animus toward PLAINTIFFS because of their Asian race and
5  Chinese descent including but not limited to CZAP's e-mailed comment to KONGSGAARD that
6  PLAINTIFFS are "*Chinese Mafia'* to which KONGSGAARD assented by replying*: "Don't get
7  yourself killed."* PELETTA used the racial slur "*The Great Wall of Wang*" referring to
8  PLAINTIFFS' supporting retaining wall built for the fire trails necessary to protect their property
9  in emails to the Napa County Building Department.  In addition, PELETTA prepared a power
10  point presentation for the Napa County Building Inspector which he titled *"The Great Wall Of
11  Wang"* continuing use of the racial slur in an attempt to bias and prejudice Gregory Baxter, a white
12  Napa County Building Code Compliance Officer against PLAINTIFFS.  PELETTA also expressed
13  racial animus and relied on racial stereotypes in communications with other Napa County Code
14  Compliance officers in an effort to prompt enforcement action against PLAINTIFFS and deny
15  them equal protection of the laws.  GOLDMAN at all times was aware of, acquiesced in, and failed
16  to prevent these and other acts in furtherance of the conspiracy to deny PLAINTIFFS such equal
17  protection of the laws, despite having the ability to do so.  GOLDMAN in fact took great glee in
18  these efforts when he stated that (put in the lawn chair quote).

19       146.   GOLDMAN's failure to prevent the conspiracy is in violation of 42 U.S.C. § 1986.

20       147.   As a result of GOLDMAN's failure to prevent or aid in preventing CO-
21  DEFENDANTS' conspiracy or acts in furtherance of the conspiracy, PLAINTIFFS have been
22  denied the right to make and enforce contracts and purchase and hold real property, and
23  PLAINTIFFS have suffered the loss of personal property and the fruits of their labor, anguish,
24  humiliation, distress, inconvenience, and loss of enjoyment of life because of DEFENDANTS'
25  actions, thereby entitling them to compensatory damages.

26       148.   The abhorrent conduct described in this Court was undertaken with malice or
27  conscious and deliberate disregard for the rights of PLAINTIFFS, thereby entitling them to an
28  award of punitive damages.

149.   WHEREFORE, to remedy the violations of PLAINTIFFS' rights, PLAINTIFFS pray for judgment against GOLDMAN as hereinafter set forth.

### EIGHTH CAUSE OF ACTION
### (Interference with Property Rights, Cal. Civil Code § 52.1
### Against Al Czap and Brian Peletta)

150.   PLAINTIFFS incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

151.   CZAP and PELETTA intentionally interfered with PLAINTIFFS' right to acquire, possess, and protect property through threats, intimidation, and coercion in violation of California Civil Code § 52.1.

152.   CZAP instigated a confrontation with PLAINTIFF Wang, moving towards him aggressively within about 3 feet, and threatening, "*We are going to kick you Chinks off this hill and drive you out of the county.  We have the whole neighborhood against you and we have the County against you.*"  On multiple occasions, CZAP made rude and threatening gestures and raced his car toward PLAINTIFFS, their family members, and employees in a threatening manner. CZAP cut down and ripped out trees and bushes which were wholly or in part on 460 STONECREST, and on multiple occasions PLAINTIFFS found uprooted plants and cut branches thrown on the ground of their property and experienced other instances of property damage as well as frequent overnight vandalism.   PLAINTIFFS understood these actions as intimidating, threatening or constituting violence to them personally or to their property in order to prevent them from acquiring or holding their property interests in the neighborhood.

153.   PELETTA also made obscene gestures at PLAINTIFFS and their employees and family members, and shouted at them when he saw them in the neighborhood, even in the presence of PLAINTIFFS' daughter who had just returned from a serious operation. He gathered neighbors and government officials at his house to harangue them with unfounded tales of PLAINTIFFS' alleged bad acts, using racially derogatory terms such as the "*Great Wall of Wang*" in his presentations intended to instigate investigations and isolate PLAINTIFFS by turning the attendees against them.  On information and belief, PELETTA tried to convince a variety of officials to pursue both criminal and administrative charges against PLAINTIFFS purportedly based on the

encroachment of PLAINTIFFS' fire trail system that had been in place for over 20 years. PELETTA also encouraged Napa County to pursue criminal action against PLAINTIFFS for code violations and based on false information, including that they "lie under oath," "cheat," evade taxes, "operate above the law with willful disregard of the law and common good," "promote the underground economy and simply cannot be trusted," and that "Wang does not have any ethics or scruple." On multiple occasions PLAINTIFFS found uprooted plants and cut branches thrown on the ground of their property and experienced other instances of property damage as well as frequent overnight vandalism. PLAINTIFFS understood these actions as intimidating, threatening or constituting violence to them personally or to their property in order to prevent them from acquiring or holding property interests in the neighborhood.

154. CZAP and PELETTA were motivated by a desire to preserve the "heritage" of the neighborhood and racial animus against PLAINTIFFS' Asian race and Chinese heritage. CZAP was further motivated to engage in this threatening and intimidating behavior by his desire to acquire land from 550 STONECREST that PLAINTIFFS had tried to purchase.

155. PLAINTIFFS reasonably believed, by CZAP and PELETTA's threats, intimidation, and coercion, that CZAP and PELETTA would commit violence against PLAINTIFFS and their property at 460 STONECREST and easement rights on neighboring properties.

156. In violation of the Bane Act, California Civil Code § 52.1, CZAP and PELETTA intended to deprive PLAINTIFFS of their right to acquire, possess, and protect property. By driving them from their home, the neighborhood and the county with threats and intimidation, CZAP and PELETTA intended to deprive PLAINTIFFS of their right to possess their property at 460 STONECREST, to protect and make use of their easement rights on 550 STONECREST and 440 STONECREST, and to acquire a portion of 550 STONECREST.

157. As a result of the misconduct alleged, PLAINTIFFS have been denied the right to make and enforce contracts and purchase and hold real property, and PLAINTIFFS have suffered the loss of personal property and the fruits of their labor, anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of CZAP and PELETTA's actions, thereby entitling them to compensatory damages.

1   158.   The misconduct described in this Court was undertaken with malice or conscious

2   and deliberate disregard for the rights of PLAINTIFFS, thereby entitling them to an award of

3   punitive damages.

4   159.   WHEREFORE, to remedy the violations of PLAINTIFFS' rights, PLAINTIFFS

5   pray for judgment against CZAP and PELETTA as herein set forth.

6   **PRAYER FOR RELIEF**

7   WHEREFORE, PLAINTIFFS pray for judgment against DEFENDANTS and as follows:

8   1.   For general damages for property damage according to proof;

9   2.   For special damages according to proof;

10   3.   For consequential damages;

11   4.   For statutory damages;

12   5.   For costs of suit herein incurred;

13   6.   For reasonable attorneys' fees according to proof;

14   7.   For punitive damages;

15   8.   For such other and further relief as the court may deem proper.

16

17   DATED:   April 12, 2022.                    Respectfully,

18

19                                               By: _____

20                                                       JASON M. SKAGGS

21                                               Attorneys for Defendants and Cross-Complainants
                                                 FRANCIS WANG, individually and as Trustee of
22                                               WFT-TNF, a California Trust; and LAURA
                                                 YOUNG, individually and as Trustee of WFT-
23                                               TNG, a California Trust

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

3

4    DATED:   April 12, 2022.                    Respectfully,

5

6                                               By: _____
                                                        JASON M. SKAGGS

7

8                                               Attorneys for Defendants and Cross-Complainants
                                                FRANCIS WANG, individually and as Trustee of
                                                WFT-TNF, a California Trust; and LAURA
                                                YOUNG, individually and as Trustee of WFT-
9                                               TNG, a California Trust

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT
Case No. 3:19-cv-00907-WHO

# EXHIBIT A

May 28, 2010

Dear Frank,

My daughter, Helen, mentioned there is a message from you on our phone machine at home. We're in France, so I'm writing.

We've done quite a bit of discovery regarding the Williamson Act. It seems that it will be possible to cancel our contract. At this point the only reason to cancel would be to partition off a piece of 550 Stonecrest so that you could buy it. Before we would proceed in that direction we would want an offer from you, then a signed agreement indicating the amount of land you would want, and then a check for earnest money.

We return to Napa June 28. We will be home just two weeks. I would hope we could organize some sort of deal then. My email address is marykongsgaard@gmail.com if you would like to be in contact in the meantime.

Do, you have a bid for the road work? Just wondering.

Sincerely,

Mary K.

DEFS 0449

# EXHIBIT B

**FRANCIS S.L. AND LAURA W.T. WANG**
**460 STONECREST DR. NAPA, CA 94558**
**252-8253**

July 8, 2010

By Telecopier: 257-2283
Mrs. Mary Kongsgaard Williams
4345 East Third Ave.
Napa, CA 94558

Re: Portion of 550 Stonecrest Dr.

Dear Mary:

It was good to speak with you today. Further to our recent conversations and your call today, this is to memorialize our agreement to purchase a 12 acre portion of undeveloped land ("12 Acre Parcel") without any water supply, in the parcel known as 550 Stonecrest Dr. The 12 Acre Parcel shall be roughly in accordance with the lines delineated on the attached plot map. We understand that you will first apply to Napa County for a lot-line adjustment between 500 Stonecrest and 550 Stonecrest, which may take a half-year, and for removal of the Williamson Act on the 550 Stonecrest Dr. parcel. After that adjustment is made, you will be able to commence the lot-line adjustment to split the 550 parcel so that 10.85 acres remain in that parcel, and sell the remaining 12 Acre Parcel to us. As we would like the property line to follow the natural ridge lines or contours as much as possible, we suggest that the .85 acres or any portion of it be available to include in the 12 Acre Parcel, if needed. The purchase price will be adjusted pro rata if any addition to the 12 Acre Parcel is required.

We have agreed to pay the sum of US$ 400,000.00 for the 12 Acre Parcel. Napa County has orally informed us the 12 Acre Parcel must be affixed and merged into our existing parcel at 460 Stonecrest Drive, and cannot be a separate parcel. However, we cannot purchase and merge the 12 Acre Parcel unless the burden of the Williamson Act contract is removed. Therefore, our agreement to buy is limited by the following conditions:

1) The parcel is not subject to the Williamson Act, and any and all liens, charges, restrictions and/or encumbrances with respect to that act shall have been discharged, removed, and/or satisfied with respect to the 12 Acre Parcel.

2) The purchase of the 12 Acre Parcel will not trigger a reappraisal of our existing parcel. Only the value of the 12 Acre Parcel will be added to the present appraised value of the 460 Stonecrest Drive Parcel to arrive at the appraised value of the merged and combined parcel. Napa County has orally assured us that this will be the procedure they will follow. We will need to obtain a more formal understanding with the County before the merger is finalized.

3) The lot-line adjustment will be commenced and completed as soon as possible. To ensure the smooth progression of the surveys, we will be involved in the survey process.

4) There is no financing contingency. Payment will be made simultaneously upon transfer of good and clear title.

We would like your confirmation that these terms represent your understanding and intent as well. Enclosed is a check for the sum of $ 7,500 for the option to purchase the land on the terms described above. The amount is earmarked as our contribution to the survey costs necessary for the lot-line adjustment between the 550 and 460 Stonecrest parcels as provided above. Please feel free to call if you have any questions.

Yours truly,

Laura Wang                    Frank Wang

Agreed and Countersigned:

for Mary, John & Martha Kongsgaard

9/8/2010

Mary Kongsgaard          Martha Kongsgaard          John Kongsgaard

DEFS 0312

# EXHIBIT C

APPLICATION #: _P11-00021_
DATE RECORDED: _____
FINAL FILING DATE: _____

### TYPE "H"
### APPLICATION FOR
### AGRICULTURAL PRESERVE CONTRACT

#### NAPA COUNTY, CALIFORNIA

**NAMES OF OWNER/OWNERS AS RECORDED** (include trust deed or other encumbrance holders). Use separate sheet if necessary:

Mary Kongsgaard, John Kongsgaard, Martha Kongsgaard

**SITE ADDRESS:** 550 Stonecrest Dr. Napa, CA    94558

**APPLICANT'S NAME** (if other than above): _____

**APPLICANT'S ADDRESS:** 4345 E. Third Ave. Napa, CA 94558

**AGENT FOR NOTICE** (person designated by Owner to receive any and all notices and communications from Napa County during the life of this Contract; Owner shall notify County in writing of any change of designated person or change of address prior to or during the term of the Contract):

Name: Mary Kongsgaard    Street address: 4345 E. Third Ave

Phone: 707-257-2263    City, State, Zip: Napa, CA 94558

cell 707 815 4000

#### DESCRIPTION OF PROPERTY

| Present Agricultural Use | Assessor's Parcel No. | Proposed Acreage |
|---|---|---|
| | 052-030-052 | 22.2 |
| | existing APN | |
| | | |
| | | |

**TOTAL ACREAGE** _____

**LAND TENURE** (Circle One):    Owner-operated/occupied    Leased    Other _____

*I certify that the above statements are correct:*
**OWNER/OWNERS SIGNATURE:** Martha Kongsgaard
Mary K.

**APPLICANT'S SIGNATURE** (if different): Mary Kongsgaard

**Please include the following information with this application form:**

- A copy of the deed.
- Copies of all trust deeds and other recorded encumbrances.
- A legal description for the property.
- A copy of the Assessor's Parcel Map showing existing structures and land use by acreage.

---

#### FOR PLANNING DEPARTMENT USE ONLY

THE ABOVE PROPERTY IS WITHIN ONE MILE OF A CITY    YES _____    NO _____

PRESENT ZONING: _____    PRESENT GENERAL PLAN DESIGNATION: _____

Receipt #_____    Date: _____    Received by: _____

Page 1 of 2

DEFS 0177

*existing apn*
*052 030 052*

### TYPE "A" AGRICULTURAL PRESERVE CONTRACT APPLICATION

The following information is required in order to determine eligibility for the Agricultural Preserve Contract:

1) Briefly describe the agricultural use of the property for the last five (5) years. Indicate crops grown and acres devoted to each crop, type and number of livestock or poultry, or any other agricultural income producing activity:

*One acre of wine grapes producing an average of two tons per acre.*

2) Is property fenced and are fences maintained? Please describe.

*Fenced against deer and vigorously maintained*

3) If used for animal husbandry, briefly describe any range management practices used to improve or maintain range. Examples might be fertilizer practices, weed management practices, land clearing, etc.

*No animals*

4) What was the gross annual income for the last five (5) years received from sale of agricultural crops produced or livestock raised on the subject property?

*One acre x average two tons per acre x $3500/ton = $7,000 average annual income*

5) What was the source and gross income from this property, other than agricultural income, for the same period?

*No income other than agriculture*

6) Please indicate, if existing:
Use Permit # _____ or Certificate of Legal Non-Conformity # _____

*I declare under penalty of perjury that the information provided is true and correct, and that the primary use of the property in question is devoted to agricultural production.*

Executed in Napa County on the dates noted below:

Date: 1/26/11   Signature _____

Date: 1/24/11   Signature _Martha Kongs___

Date: 1/27/11   Signature _Mary Kryggaard_

*****

Agricultural Commissioner's comments: _____

_____

Signature of Agricultural Commissioner/Deputy: _____   Date: _____

DEFS 0178

# EXHIBIT D

April 4, 2011

Dear Laura and Frank,

We regret that we have been unable to reach an agreement concerning the 12 acres belonging to 550 Stonecrest. We are no longer interested in pursuing negotiations. With this letter we are returning the check for $7500. that you gave to our brother, John Kongsgaard. It is in the form of a cashier's check.

Sincerely,

Mary Kongsgaard
Martha Kongsgaard

DEFS 0492

# EXHIBIT E

**From:** alczap@gmail.com [mailto:alczap@gmail.com]
**Sent:** Saturday, October 28, 2017 9:55 AM
**To:** kongsgaard martha <martha@kongsgaard-goldman.org>
**Subject:** Update on Stonecrest

KONGSGAARD 00074



Hi Martha,



I hope all is well with you and Peter.  Send us rain please.



It is nice to be able to sleep again without fire danger.

4

KONGSGAARD 00075

I am 3/4 of the way done with the pipe replacement trench on the property, see photo.  In the trench was not only the 2" pipe which was the current supply to my house and pretty nasty and black goo lined inside, but also there is the very old original pipe from the well below which is literally falling apart.  I have offered to John and Alex to put in a new feed that could be worked over to your house.  It could come up in that trench and from there we could curve your pipe over to the old 2" feed line that comes above ground mid property.  I think a 1 or 1 1/4 inch new PEX line could be pulled through that pipe under the vineyard using the old one as a conduit.  We would have to assess that.

I saw Alex 2 days ago and had a discussion about the email I had sent him and John about potentially ripping up the street below and replacing all that feed system to the meters with new pipe and having the pump people replace the holding tank which is full of mud crud.  The actual pumps appear to be in good condition.  It would be a project but there was one leak in the road down there and there will be others.

I still would like to purchase the property warts and all and just deal with Wang myself.  In the meantime, while digging the trench I have assessed the fire danger as the property exists.  Attached are just a few photos.  There are a number of downed old dry trees as well as many standing dead with branches touching the ground.  I can simply push on one with the small excavator and it falls over.  In addition there are clumps of very dry, dangerous brush.  I know we discussed on the phone some of this but I would like your permission to clear some of this up soon.  I will be renting a small skid steer, which is a little Bobcat loader that I will use to move sand to put in the trench to bed the pipes.  I can just rent it for a month and Jose and I can pull some of the dead wood and brush and stage it for a service to chip and haul.

Please let me know your thoughts.
Best
Al




Al Czap
1370 Trancas St. #350
Napa, Ca 94558
cell 208 290 5098

KONGSGAARD 00076

# EXHIBIT F

Sorry to lay this at your feet but we are full disclosure neighbors!!
Best
A

this is kind of cool, hit the wire this a.m.

https://finance.yahoo.com/news/tesseract-medical-research-launches-breakthrough-133000782.html

Begin forwarded message:

**From:** "alczap@gmail.com" <alczap@gmail.com>
**Subject: Stonecrest update**
**Date:** January 20, 2018 at 4:47:45 PM PST
**To:** Martha Kongsgaard <martha@kongsgaard-goldman.org>

Hi Martha,
I hope all is well up in the chilly Northwest!

We are doing well here in our cozy home.

I was talking with Alex the other day as I was doing a walk on the hillside areas looking at the fire danger from the existing trees.  I know we have discussed in the past the possibility of my purchasing the surrounding land and maintaining it.  I am again hoping you might consider that.  I had offered $150,000 cash for the property and would deal with Wang.  It really does not appear that he is encroaching, just dumping some tree cuttings uphill a bit from his property.

I do have an alternate proposal which would be $100,000 and you would keep the driveway all the way down and the property on the other side of the driveway.  I could purchase everything from a line five feet uphill from the edge of the drive and you would still have the access ownership that way plus that land on either side.  I could keep it trimmed and potentially install a large cistern near my house and put in a barrier sprinkler system hooked to my electric system which has a generator.  This could be used also by the fire department in an emergency as the nearest hydrant is at Wang's entrance.

As I look at the burned hills in the distance and the global weather situation, I am very concerned (as I expressed to Alex) that we will have similar fires again in the valley again within 2-3 years.  This is a problem that will not go away, it is simply physics.  I think the area below your gatehouse has a lot of ivy and maintains quite a bit of moisture so it is much less vulnerable in future but could have some branches and a few dead bushes trimmed.  We could put a sprinkler line there as well though.

Please let me know your thoughts on this.

Thanks much for considering this.

Al

P.S. It appears that I have an extremely viable treatment for Parkinson's so things are getting very interesting on the business front!

Al Czap
Tesseract Medical Research, LLC

CZAP 000223

# EXHIBIT G

Napa, Ca 94558
cell 208 290 5098

Begin forwarded message:

**From:** Brian Peletta <bpeletta@gmail.com>
**Subject: Re: 440 Stonecrest Drive Survey and Encroachment by Wang**
**Date:** July 23, 2018 at 12:24:32 PM PDT
**To:** kongsgaard martha <martha@kongsgaard-goldman.org>
**Cc:** Al Czap <alczap@gmail.com>

Marth and Peter:

Thank you for the quick reply.  I know a little of the history with the families.  Such a long history and heritage.  I believe in the preservation.

I'm not looking forward to the encounter with Wang, however, I need to assert my rights or risk loss now that it will be official and recorded.  Al has mentioned the desire to purchase the 10 acres and noted the complexity.  I too would be interested in the half-donut adjoining my property just to avoid any questions/ complications with Wang in the future.  We just want Wang to be " boxed in",  he can do whatever he wants, provided he has the proper permits and stays within his boundaries.  Having employed 4 FTE's for the 4 years since  I've been here, I questioned what he has been up to and the amount of money he has spent.  Last week he had another pallet of concrete delivered by Home Depot, nothing seems to deter him from his development and knowing he has major problems to deal with.

Finally, until the County takes action and Red Tag's the job site it is business as usual. With notification from my attorney believe me, I will begin to assert my rights and remove his crap from my property and regain access.  I do not plan to play his game nor give him an inch.... he will have to pay me an insane amount of money to keep his wall, fix it, properly divert the water and purchase the .17 acre he has stolen.

I will keep you posted on the events.  We've all become friendly with Alex and John during the fire and the Stonecrest water project.  I still can't get on the wine list though...LOL

On Mon, Jul 23, 2018 at 11:42 AM, kongsgaard martha <martha@kongsgaard-goldman.org> wrote:

Brian

Thanks for all of this.  What a bloody saga!  I couldn't be happier that you are on this.  Of course you have permission to go on my property any time, with or without Al.

Our relationship goes much further back and without boring you with all of the details, suffice it to say that we got hip to the fact that they had pretty massively encroached with irrigation, paths, lighting and a grotto and tall walls built without permits for sure the year my mother died in 2009.  My parents and my father specifically (who had an artificial leg which he lost in WWII so couldn't walk down that hill to see the encroachment – to say nothing of my mother who never walked around a block in her life!)  told Frank Wang years ago that they could do fire abatement on our property line if there were overhanging trees or brush – as the laws requires.  He granted them permission and I am sure that he

CZAP 000243

# EXHIBIT H

| | |
|---|---|
| **From:** | alczap@gmail.com |
| **Sent:** | Tuesday, July 24, 2018 1:40 PM |
| **To:** | Gregory Baxter |
| **Cc:** | kongsgaard martha; Brian Peletta; Peter Goldman |
| **Subject:** | Wang, 460 Stonecrest |
| **Attachments:** | 3939-00.pdf |

Hi Greg,

I have copied Brian and Martha on this email, as well as Peter, Martha's husband, who are respectively at 440 and 500-550 Stonecrest.

Thank you for the follow through visit this morning. As I said to you, Martha has given me permission to walk anywhere on her property to perform work to lessen fire danger as well as for any reason that is beneficial to her interest.

Martha, would you be kind enough to replay to this email indicating your willingness to let Napa County officials walk your property for evaluation of the changes Wang has made on your property and his. This way, without trespass, they can document from your property Wang's work on his property prior to the process of them gaining access with or without his permission. It may take a few weeks to get a court order if he is stubborn. Additionally, I am providing your phone number and address to Greg for any official communication he will need to send to you.

206 817 5473 and address: 4408 Beach Drive S.W. Seattle WA 98116

Attached is the survey of Brian's property line showing the massive encroachment by Wang on his property. It is several hundred feet long, perhaps 15-22 feet high in places and about 25 feet wide in places. It appears that the stone stack wall they built is with the wrong type of precast stack stone and likely will all have to come out under supervision of engineers on a daily basis.

The surveyors have made a preliminary pass and we are finding a time where I can be with them for the corner setting as it appears that Wang has removed some markers. It has been strongly suggested to me that the property line be delineated very clearly so photos can be taken that are detailed showing the encroachment with no question. This will mean placing a marking line 1 or 2 feet on your side the length of the property line. This way Wang cannot say the surveyors encroached and at any future trial of Wang there will be an obviousness to the encroachment documented perfectly in pictures. Unless you tell me differently, I will instruct the surveyors to do so and be careful not to mark any part of the Wang property. Some of the stakes put in by the surveyors with yellow flags on them have already had the flags removed by Wang people. We will also ask Greg to get a stipulation in any stop order that they are not allowed to remove any survey marks.

Martha, I have no problem running point with Wang, it would be fun. I have dealt with attorneys, judges and government officials for many years, including helping the FDA on some projects so this is really not hard.

With best regards,
Al

8

KONGSGAARD 00041

# EXHIBIT I

Notes on March 28th, 2019 Incident at Stonecrest

March 28th, 2019

Around noon office staff called to say that Czap has been prowling around all morning taking videos of them as they were moving the stone sculpture.  They were feeling nervous with him lurking around again video recording them.  When they would see him he would try to hide behind some trees or bushes, but continued videoing them.

1) I went out from my office to ask him what he was doing.
2) I asked him what he was doing and why.
3) He was very belligerent and during the discussion approached me waving his arms and appeared to want to physically fight with me.  It was evident to me that he wanted to provoke me.
4) He said the following:
   a. Surprised you're here, you're never here – I've been watching you.
   b. I'm on Martha's property and she gave me all rights to be here.  I represent her.
   c. I'm tired of seeing your Illegal Mexicans out by your gate every morning.
   d. They're illegal and you pay them under the table.  It's a crime.
   e. I'm going to have them deported.
   f. You are criminals who cheat on your taxes, steal other people's property, lie under oath, etc.
   g. You're a bad element in this neighborhood and the town.
   h. We're going to kick you Chinks off this hill and drive you out of the county.  We have the whole neighborhood against you, and we have the county against you.
   i. We've made sure the neighborhood and county know what you are doing and what kind of people you are.
   j. We're going to take the water pump away from you – we have rights and you have ignored them.
5) After all this, he did succeed in provoking me.  I did lose my temper and told him he was evil and that he would die a horrible death because of his bad karma.

# EXHIBIT J

as soon as possible so that the property can be restored to its natural state and in compliance with Napa code.

Peter Goldman

---------- Forwarded message ---------
From: **Bagley, Shana** <Shana.Bagley@countyofnapa.org>
Date: Wed, Mar 27, 2019 at 9:47 PM
Subject: Re: 460 /440 Stonecrest Demand Letters
To: Brian Peletta <bpeletta@gmail.com>, Baxter, Gregory <Gregory.BAXTER@countyofnapa.org>, Flaherty, Timothy M. <tflaherty@clarkhill.com>, Melissa Palozola <mpalozola@clarkhill.com>


Mr. Peletta, Ms. Palozola, and Mr. Flaherty,

Please see the attached demand letter that I sent to Mr. Wang and Mr. Jameson today.

Shana

---

**From:** Brian Peletta <bpeletta@gmail.com>
**Sent:** Sunday, March 24, 2019 9:59:52 AM
**To:** Bagley, Shana; Baxter, Gregory; Flaherty, Timothy M.; Melissa Palozola
**Subject:** 460 /440 Stonecrest Demand Letters

Shana and Greg:

Thank you both for discussing the code violations caused by Wang. As you know in August 2018 the County became aware of the significance of the code violations caused by Wang as a result of my property survey.  The Wang's have knowingly, consciously been engaged in:

- unlawful construction,
- encroached on my land and Kongsgard,
- cause damage to the environment,
- avoid payroll taxes, worker's compensation, permit fees,

clearly a case of gross negligence for admittedly 30 years.  I believe you understand the dependencies and constraints I have with respect to correction action of the code violations I've been cited for.  I had nothing to do with these codes violation Wang created them.

The law firm of Wang and Wang is a global powerhouse with offices throughout the world and a significant amount of resources. I do not have the financial resources that Wang has. As you have witnessed they have aggressively pursued litigation when I built my fence to protect me from potential liability and risks. I believe the County will get a similar response.  Wang does not have any ethics or scruples, they lie under oath in their declarations, cheat the government out of taxes, private citizens out of land and property rights, promote the underground economy and simply cannot be trusted. They are privileged and operate above the law with willful disregard of the law and common good.  They are a disgrace to their profession and I can't believe UC Berkeley and other institutions would choose to have any association with Wang and Wang when they learn about their life of hypocrisy.

CZAP 000074

Based on  Kongsgard and Peletta cases to date, the probability of lengthy and costly litigation might be expected. Wang and Wang have had almost a year to prepare for this battle.

Know you have our full cooperation.  We would appreciate a copy of the demand letter when it becomes public record.  While I do not expect special treatment, I do appreciate the County's consideration of my circumstances.

Best regards,

 --
Brian  Peletta
bpeletta@gmail.com
415-860-1812 Cell


--
Brian  Peletta
bpeletta@gmail.com
415-860-1812 Cell

Begin forwarded message:

**From:** Brian Peletta <bpeletta@gmail.com>
**Subject: Fwd: 460 /440 Stonecrest Demand Letters**
**Date:** March 27, 2019 at 4:52:16 PM PDT
**To:** Al Czap <alczap@gmail.com>


---------- Forwarded message ---------
From: **Brian Peletta** <bpeletta@gmail.com>
Date: Sun, Mar 24, 2019 at 9:59 AM
Subject: 460 /440 Stonecrest Demand Letters
To: Shana Bagley <shana.bagley@countyofnapa.org>, Baxter, Gregory <Gregory.BAXTER@countyofnapa.org>, Flaherty, Timothy M. <tflaherty@clarkhill.com>, Melissa Palozola <mpalozola@clarkhill.com>


Shana and Greg:

Thank you both for discussing the code violations caused by Wang. As you know in August 2018 the County became aware of the significance of the code violations caused by Wang as a result of my property survey.  The Wang's have knowingly, consciously been engaged in:

- unlawful construction,
- encroached on my land and Kongsgard,
- cause damage to the environment,
- avoid payroll taxes, worker's compensation, permit fees,

CZAP 000075

clearly a case of gross negligence for admittedly 30 years.  I believe you understand the dependencies and constraints I have with respect to correction action of the code violations I've been cited for.  I had nothing to do with these codes violation Wang created them.

The law firm of Wang and Wang is a global powerhouse with offices throughout the world and a significant amount of resources. I do not have the financial resources that Wang has. As you have witnessed they have aggressively pursued litigation when I built my fence to protect me from potential liability and risks. I believe the County will get a similar response.  Wang does not have any ethics or scruples, they lie under oath in their declarations, cheat the government out of taxes, private citizens out of land and property rights, promote the underground economy and simply cannot be trusted. They are privileged and operate above the law with willful disregard of the law and common good.  They are a disgrace to their profession and I can't believe UC Berkeley and other institutions would choose to have any association with Wang and Wang when they learn about their life of hypocrisy.

Based on  Kongsgard and Peletta cases to date, the probability of lengthy and costly litigation might be expected. Wang and Wang have had almost a year to prepare for this battle.

Know you have our full cooperation.  We would appreciate a copy of the demand letter when it becomes public record.  While I do not expect special treatment, I do appreciate the County's consideration of my circumstances.

Best regards,

 --
Brian  Peletta
bpeletta@gmail.com
415-860-1812 Cell



--
Brian  Peletta
bpeletta@gmail.com
415-860-1812 Cell

Begin forwarded message:

**From:** Brian Peletta <bpeletta@gmail.com>
**Subject: Fwd: 460 /440 Stonecrest Demand Letters**
**Date:** March 28, 2019 at 8:08:27 AM PDT
**To:** Al Czap <alczap@gmail.com>, Martha <martha@kongsgaard-goldman.org>, "Peter Goldman (pgoldman@wflc.org)" <pgoldman@wflc.org>

Here's the demand letter.  You'd have to have an army of subcontractors and project managers to make the deadline.  @Al I believe yesterday Central Supply had a delivery at Wang's yesterday. The guys we moving the pallet jacks around on the ATV.  Note the cease and desist on the construction without permits. If they don't make the dates the min fine is $365K

Good things happen to Good People

---------- Forwarded message ---------
From: **Bagley, Shana** <Shana.Bagley@countyofnapa.org>
Date: Wed, Mar 27, 2019 at 9:47 PM

4

# EXHIBIT K

**From:** Peter Goldman [mailto:pgoldman@wflc.org]
**Sent:** Thursday, March 28, 2019 2:04 PM
**To:** alczap@gmail.com
**Cc:** kongsgaard martha <martha@kongsgaard-goldman.org>
**Subject:** RE: Wang

Jesus, that guy is a complete basket case. I'm sorry that he complained about your after the fact building permit situation. I'm surprised the county even responded to him given that he's the biggest code violator in the County. It's like the arsonist calling the fire department to report that his neighbor is creating a fire hazard by letting his grass grow too long.

Personally, I did not realize one needs a building permit for windows and doors (must be energy code motivated?).

I will keep this on file. Of course, you have the right to seek a protective order if you feel genuinely threatened by him. Wang is facing the expenditure of millions of dollars and is going to watch his little castle grounds be dismantled piece-by-piece. We will set up lawn chairs on Martha's property to watch the show!

Peter

**From:** alczap@gmail.com <alczap@gmail.com>
**Sent:** Thursday, March 28, 2019 1:42 PM
**To:** Peter Goldman <pgoldman@wflc.org>
**Subject:** Wang

Hi Peter,
Don't want to bother Martha with this.

Wang filed a complaint a few weeks ago about me doing unpermitted work on my guest house and old carport. I had the building guy, Greg Baxter, out this a.m. to sort it out. I need to apply for after the fact permits on replacing doors and windows, etc...

9

**KONGSGAARD 00260**

Asked him if he wanted to wander down a moment to take a glance at Wang's as Central Valley delivered pallets of stone yesterday. They drove up here by mistake. He said he had things to do. Brian called and wanted to come up to see if we could see if they were in violation of the stop work so we went down and stood by a tree to see what the noise was. They were digging and moving a large beam and putting in some kind of large pavers. When they went to lunch I stayed on your property and got closer to take a photo for Greg if they looked like they were doing something out of sort. Wang then came out and confronted me and told me I was an evil person and he predicted I would die a violent death. I did not get the first on video but you can see what he said when I asked if he was threatening me. I want you to have it as a record. I will send a dropbox link.

He believes I am evil and the cause of all his woes. He stated that it would be my karma to die a violent death.

Nice guy. Anything happens to me, please check it out!!
Best
A


Al Czap
Tesseract Medical Research, LLC
https://www.tessmed.com/
https://foundationalmedicinereview.com/
https://zerohd.com
Czap R&D, LLC
Founder, Former Owner, Thorne Research, Inc.  thorne.com  (sold 2010)
Publisher, Founder Alternative Medicine Review, LLC
1370 Trancas St. #376
Napa, Ca 94558
cell 208 290 5098

KONGSGAARD 00261

# EXHIBIT L

From: kongsgaard martha
Sent: Friday, March 29, 2019 12:29 PM
To: 'Al Czap' <alczap@gmail.com>
Subject: RE: Wow

Got it.   I spoke to Imboden this morning about a lot of things.  He is getting geared up to think about this pump redo business.  There is so much going on.  I have to fix the little cottage's shower and bathroom, the main house bath room and then pay all of these lawyer bills from the Wang deal.  It is so surreal!
I can't believe that little clip of him.   No threat!  Bad karma, Jack....????
M

-----Original Message-----
From: Al Czap [mailto:alczap@gmail.com]
Sent: Friday, March 29, 2019 11:55 AM
To: kongsgaard martha <martha@kongsgaard-goldman.org>
Subject: Re: Wow

See the texts I just sent.

This is the tree thing that Matt at 473 (I think) Lehr sent a text about.  There was a tree on the power line outside the fence at the water station.  PGE would not do anything.  I texted you, got Wang's contact, Matt could not reach them. I told him we could remove it with excavator but his wife did not want him to.  I went down and pulled it off the line before it brought the line down on a person or vehicle.  It was on your property with one root going into Wang property. I set the tree down, Wang's guys cut it up and put it in their little vehicles and took it through the gate.  Laura came out and accused me of stealing a tree.  I pointed out it was not on her property.  She stomped her foot with an arrogant huff and said it was.  I got the survey done to prove them wrong.  She later filed a complaint of theft and trespass and the Deputy came out and I showed the county map and where the tree was and he said I was in the right.

Also in the text is when the pump failed and I got hold of Imboden as they could not get out to fix it.  Mike told me to jump the fence and which breakers and relays to switch as well as which valves to throw for the backup pump.  I texted Matt to see if it all worked well.  The water was muddy for a bit from the pressure tank.  Later they came out and

3

KONGSGAARD 00254

replaced the pump motor or the pump.  It all needs replacing.  It may be their property but the association or any member has the right to deal with a problem.

They are just greedy  arrogant people.

best
A

> On Mar 29, 2019, at 10:05 AM, kongsgaard martha <martha@kongsgaard-goldman.org> wrote:
>
> Oh boy
> On another topic in their complaint they talk about An encroachment of an electrical utility powerline on their property. Do you know what this is?
>
>> On Mar 29, 2019, at 9:21 AM, Al Czap <alczap@gmail.com> wrote:
>>
>> Chinese Mafia! 😊
>>
>>> On Mar 29, 2019, at 9:15 AM, kongsgaard martha <martha@kongsgaard-goldman.org> wrote:
>>>
>>> Don't get yourself killed!
>>> Good lord.... Who talks like that?
>>>
>>> Martha

4

KONGSGAARD 00255

# EXHIBIT M

**Baxter, Gregory**

| | |
|---|---|
| **From:** | Brian Peletta <bpeletta@gmail.com> |
| **Sent:** | Thursday, September 13, 2018 8:40 AM |
| **To:** | Baxter, Gregory |
| **Subject:** | Fwd: Extension request |
| **Attachments:** | County of Napa Building Ext 9132018 Peletta Wang.png |

Greg:
Reference Code Enforcement case #  CE18-00201

Attached please find my extension request for 45 days from the date of Violation Letter issued by the County of Napa related to Wang's encroachment. In future correspondences, I may reference GWOW ( Great Wall of Wang)  my project name for the clean-up and remediation effort.

Please confirm this is acceptable an approved extension.

From: **Baxter, Gregory** <Gregory.BAXTER@countyofnapa.org>
Date: Tue, Sep 11, 2018 at 2:27 PM
Subject: Extension request
To: Brian Peletta <bpeletta@gmail.com>

Your Code Enforcement case # is CE18-00201

1

COUNTY 000047
PELETTA 0441

# EXHIBIT N



# GWOW Project Status Report

Brian Peletta • Jan 17,, 2019

COUNTY 000012
PELETTA 0406

# Oct 2018 Status Report

Peletta Violations 440 Stonecrest

Wildlife and Board of Water of CA performed a site visit.

Action: Water Board to engage with the County on oversight and review erosion control plans.

No progress because of Wang delays in producing Topo Maps of all Walls.

Next Steps: Wang to excavate and provide sample evidence proving the walls are properly designed and engineered to mfg specifications and code compliant. No timeline provide by Wang.

COUNTY 000038
PELETTA 0432

# Attendees

Sept. 26, 2018

Site Visit By State of California

Water Board

Wildlife

**Subject Matter Experts**

Agnes Farres Water Board State of Cal

Garrett Allen Wildlife Scientist

Residents

Al Czap 600 Stonecrest - Guide

Brian Peletta 440 Stonecrest Host

Martha Kongsgaard Property Owner***

Representatives Peletta /Kongsgaard

Tim Flaherty Lead Attorney Clark hill

Melissa Palozola Senior Attorney Clark Hill

COUNTY 000039
PELETTA 0433

# EXHIBIT O

 AT&T  LTE          8:43 AM                    80% ▭

< 152



AC

Al >

god yes they are that bad. They are that bad but I also know you're terribly malicious Mr. Czap!!!



Just emailed tree bid. Ugh. I can get boxes @$300 a pop. Might take 8 loads or more but way cheaper and no chip piles.

Brian at 440 Stonecrest is surveying his line where Wang built his wall onto his property. He is going after him. I am thinking of just paying for a survey on your line and the line at the pump station to define them since surveyor will be there. Would you care?

Just for FUN!!!

I wouldn't care



  iMessage 

       

KONGSGAARD 00554

# EXHIBIT P

**From:** kongsgaard martha
**Sent:** Thursday, August 02, 2018 1:36 PM
**To:** 'Lyoung@Wangandwang.com' <Lyoung@Wangandwang.com>
**Cc:** Peter Goldman <pgoldman@wflc.org>
**Subject:** Al Czap

Hi Laura,

I wanted to simply clear up my relationship with Al.  You I think misunderstood me and wrote: "*...... you have authorized him to care for the property.  Now I know that he is operating under your aegis.  His actions go well beyond "taking care of the property", and I don't expect that you authorized him to engage in a campaign to harass.*"

Al is not acting 'under my aegis.' He is a neighbor who has been given my explicit permission to enter my property to clear brush for fire protection.  He asked permission to enter, asks permission to cut and haul old limbs and grass that pose a problem and communicates frequently with photos of work progress and a running list of projects on my property that protect all of us on the hill.  I greatly appreciate his cooperation and transparent communication with me.

He also was extremely helpful last year during the fire as he and my renter, George Dom, did night watch and day vigil and communicated with me and my sister and brother during that very trying time.  I quite obviously don't have any control or interest in his actions beyond those mentioned above that I appreciate.

Thanks,

Martha

KONGSGAARD 00319